TOULON, Appellant, v. NAGLE, Respondent.*

*No. 270. Submitted under sec. (Rule) 251.54 February 5, 1975.—*
*Decided March 6, 1975.*
(Also reported in 226 N. W. 2d 480.)

---

* Motion for rehearing denied, with costs, on June 3, 1975.
DAY, J., took no part.

For the appellant the cause was submitted on the briefs of *La Follette, Sinykin, Anderson & Abrahamson,* attorneys, and *Earl Munson, Jr.,* of counsel, all of Madison; and for the respondent the cause was submitted on the brief of *John M. Wiley* of Wausau.

CONNOR T. HANSEN, J. Nagle Motors, Inc., was an automobile dealership established for the purpose of selling and servicing of Volkswagen automobiles. This case is a sequel to *Nagle Motors v. Volkswagen N.C. Distributor* (1971), 51 Wis. 2d 413, 187 N. W. 2d 374. In that case the dealer sought a permanent injunction to prevent cancellation of the dealer's franchise. Judgment was entered dismissing the complaint. The dealer appealed and the judgment was affirmed. On the instant appeal we only set forth those additional facts necessary to resolve the issues presented.

In 1961, appellant, Toulon, and respondent, Nagle, whom appellant had sought primarily as a financial contributor, attempted unsuccessfully to obtain a dealership

franchise for the sale of Volkswagens in Middleton, Wisconsin. In 1964, however, Toulon was offered the opportunity to obtain the franchise, and he again sought Nagle as a financial contributor to the venture.

Toulon testified that pursuant to negotiations between the parties, it was agreed that a corporation would be formed with a capitalization of $50,000, $40,000 of which would be contributed by Nagle, and $10,000 by Toulon. The ownership was to be split 75–25 percent, respectively, as Toulon was to receive $2,500 worth of stock as a finder's fee and for setting up the dealership. Toulon further testified that he was to be given five years in which to purchase, at the original investment rate, 50 percent of the corporate stock, at a total cost to the appellant of $22,500. Nagle, in addition to supplying most of the capital, was to buy the land and construct a building which he would in turn lease to the corporation.

In November, 1964, the parties applied for the dealership, stating in their applications that Nagle was going to invest $40,000, and Toulon $10,000. The capitalization of the corporation was established on the basis of the amount required during the negotiations in 1961. A letter of intent was obtained from the Volkswagen distributor (hereinafter VW) in June, 1965, indicating that the parties could go ahead and set up the dealership. However, the letter raised the required capitalization to approximately $70,000. The letter also stated as a condition to the franchise that the ownership was to be split 75 and 25 percent to Nagle and Toulon, respectively.

In order to meet the increased capital requirement, Nagle agreed to loan $20,000 to the corporation on an installment note to be paid back out of the corporate profits.

The corporation was formed and, after some delays, the dealership opened on January 4, 1967. Nagle executed the loan and purchased his stock. Toulon, however, did

not have the funds required for his investment, having spent what he intended to invest on his living expenses during the delays in getting the dealership open. When the actual franchise was received, the ownership requirements had been altered to 80–20 percent, and the capitalization requirement had been increased to approximately $79,000.

Robert W. Aagaard, Nagle's personal lawyer and the lawyer and secretary for the corporation, testified for Nagle, that he thought the ownership requirements had been altered by VW because Toulon was unable to make his contribution. He was unsure, however, of the exact reasons for the change. Toulon testified that it was changed at the request of Nagle who did not wish Toulon to have the benefit of the finder's fee until he was able to purchase half of the stock.

Again, because of the increased capitalization requirement and because Toulon had yet to purchase his stock, Nagle loaned the corporation an additional $5,000, on a demand note, on September 1, 1967.

Pressure was applied by VW in the summer of 1967, to get the equitable ownership of the corporation to the level specified in the franchise. Toulon attempted to purchase $5,000 worth of stock, but the first check was returned for insufficient funds. He was then able to borrow some money, drew a $1,000 advance on his salary from the corporation and purchased the $5,000 worth of stock. The salary draw was repaid to the corporation by making an additional loan, pledging the stock as security.

In October, 1967, the parties, in consultation with VW, agreed upon objectives for the year 1968. Included therein was a need to improve the cash position of the dealership. On January 4, 1968, Nagle, on a demand note, loaned the corporation an additional $35,500.

In December, 1967, Nagle proposed a written stock option agreement which was rejected by Toulon. Toulon testified that it differed from their agreement in that the proposed option required that the 50 percent be purchased from the corporation rather than from Nagle, costing, therefore, $35,000 rather than $17,500, in addition to his current holdings as the original agreement would have required. The proposed agreement was also conditional on Toulon remaining an employee of the corporation, unlike the original agreement.

Because the ownership provisions of the franchise agreement had not been met, and because Toulon and Nagle were in a dispute over several aspects of how the business was being run, VW did not issue a new franchise at the beginning of 1968. A meeting was held in late February, 1968, to try to resolve the differences. At this meeting, Toulon announced that he was prepared to purchase 50 percent of the business. A meeting was scheduled for March 2, 1968, to conduct the sale. On that day, however, after Nagle, lawyer Aagaard, and the corporation bookkeeper had spent the previous evening going over the cash accounts with regard to Toulon's withdrawals, Nagle fired Toulon.

On March 5, 1968, at a further meeting with the parties and VW, Toulon tendered an offer to purchase $5,000 worth of stock from the corporation and $12,500 for 150 shares of Nagle's stock, which would have given Toulon a 50 percent interest. Nagle summarily rejected the offer without reading it. Richard P. Whitehill, a friend of Toulon, testified that he was ready on that date to loan the money for the purchase and would have loaned up to $40,000.

It was undisputed that the corporation exceeded the sales goals set for it in the first year by VW and produced an after tax profit in 1967, of $14,548. Before the difficulties arose, it was anticipated by both parties that

1968 would prove to be a better year. Thomas McGann, the subsequent purchaser of the dealership from VW after VW canceled the franchise in 1969, testified as to the profitability of the dealership after being qualified as an expert by Toulon. Based on the assumption that the two parties would continue to cooperate and that the cash shown needed by the 1968 dealer objectives was available, McGann opined that they could have expected to make about $20,000 after taxes in 1968. McGann's own profit from the dealership in 1972 was 29.6 percent of his invested capital and he expected that to increase to 40 percent in the upcoming year.

The tax returns for the corporation for 1968, 1969, and 1970, showed a taxable gain of $3,105 in the first year and losses of $21,457 and $2,161 in the remaining two years. During these years the dealership was being run solely by Nagle who was totally inexperienced in running an auto dealership when the venture started. We note the 1969 income tax return, the year of the largest loss, shows a $30,000 deduction for "professional fees" and a similar deduction in 1970 of approximately $10,000. Gross income increased in the first two years and was slightly less in the last year, a partial year.

The following issues are dispositive of this appeal:
*Appeal:*
Were Nagle's postverdict motions timely made?
Was the jury's damage verdict excessive?
*Cross Appeal:*
Are the jury's answers to specified special verdict questions supported by sufficient credible evidence?
Should judgment be entered for Nagle notwithstanding the verdict?

We deem it essential to first consider the timeliness of Nagle's postverdict motions as that question is of threshold importance. We will then discuss the cross-appeal

issues, and lastly the issue of whether the jury awarded excessive damages.

*Timeliness of Nagle's postverdict motions.*

Toulon contends that Nagle's motions after verdict were not made and decided within the two-month time limit of sec. 270.49, Stats., and no written order extending the time for cause was made by the trial court.

The verdict was rendered on January 24, 1972. The record shows that the date for postverdict motions was ordered by the court to be April 7, 1972. The order was made in open court with both parties present. The cause for the extension of time was to permit transcription of the record and absence of the judge due to vacation.

On February 11, 1972, the parties were sent a notice by the clerk rescheduling the motions to April 21, 1972. The notice did not recite that the extension was by order of the court and it failed to state any cause for the extension. The transcript was completed on March 24, 1972, and Toulon's motion for judgment on the verdict was made on April 7, 1972, the date originally scheduled. Nagle's motions were not filed until April 11, 1972. Subsequent extensions were made by the court for cause after April 21, 1972, and are not contested by Toulon.

Under this sequence of events relating to the extension of time on the filing and determination of motions, the trial court ultimately granted Nagle's motion for a new trial on the issue of damages with an option to Toulon, pursuant to *Powers v. Allstate Ins. Co.* (1960), 10 Wis. 2d 78, 102 N. W. 2d 393, but denied the rest of Nagle's motions.

We find the decision of the trial court on the postverdict motions to be persuasive. Unfortunately the record does not show that the extension granted from April 7, 1972, to April 21, 1972, was by order of the court for cause, as required by sec. 270.49, Stats. *Loo-*

*mans v. Milwaukee Mut. Ins. Co.* (1968), 38 Wis. 2d 656, 158 N. W. 2d 318; *Anderson v. Eggert* (1940), 234 Wis. 348, 291 N. W. 365; *Beck v. Wallmow* (1938), 226 Wis. 652, 277 N. W. 705. We determine, therefore, that the instant order granting a new trial on the issue of damages, with option to accept a lesser amount and denying Nagle's other motions is ineffective and void. *Graf v. Gerber* (1965), 26 Wis. 2d 72, 76, 131 N. W. 2d 863.

However, on appeal, both parties concede that this court can exercise its discretion and award a new trial in the interest of justice. Sec. 251.09, Stats. Therefore, our discussion of the issues raised by the parties is based on our independent review of the record with a view toward determining whether there would be a probable miscarriage of justice if the jury's verdict was permitted to stand.

### Answers to the special verdict.

Nagle's motion to change certain answers of the special verdict questions the sufficiency of the evidence to support those answers. When there is credible evidence which under any reasonable view fairly admits of an inference which is sufficient to support the jury's findings, the findings should not be changed. *Repinski v. Clintonville Federal Savings & Loan Asso.* (1970), 49 Wis. 2d 53, 181 N. W. 2d 351; *St. Paul Fire & Marine Ins. Co. v. Burchard* (1964), 25 Wis. 2d 288, 130 N. W. 2d 866. This is especially true on review in this court where the verdict has the approval of the trial court. *Shoemaker v. Marc's Big Boy* (1971), 51 Wis. 2d 611, 187 N. W. 2d 815; *Capello v. Janeczko* (1970), 47 Wis. 2d 76, 176 N. W. 2d 395. The evidence must be viewed in the light most favorable to the jury's verdict. *Shoemaker v. Marc's Big Boy, supra; St. Paul Fire & Marine Ins. Co. v. Burchard, supra.*

Question number one of the special verdict asked, in substance, whether there was an agreement between the parties permitting Toulon to purchase $10,000 worth of stock with an option for him to purchase from Nagle within five years 50 percent of the original stock at the issuing price with a finder's fee of $2,500. The jury answered this question affirmatively and Nagle contends that the answer should be changed to "No" as there was no proof that the parties ever agreed as to the source of the stock Toulon could purchase.

Toulon testified that the original agreement between the parties, based on a corporate equity capitalization of $50,000, called for an initial investment by him of $10,000 for $12,500 worth of stock after crediting the finder's fee. He was then to be permitted to purchase the additional shares, up to 50 percent, for a total investment of $22,500. The testimony raises the reasonable inference that the parties agreed the finder's fee stock and the shares purchased after the initial investment were to come from Nagle as his initial investment was to be $40,000. Toulon also testified, and the subsequently issued letter of intent reflected, that the initial $10,000–$40,000 investment ratio was to result in a 25–75 percent ownership. This raised the further reasonable inference that the stock for the $2,500 finder's fee had to come from Nagle, otherwise the corporation would have had outstanding stock of $52,500, of which $12,500 would not represent 25 percent.

Nagle denied that the source of the stock had been agreed upon; however, both Toulon's lawyer and Nagle's lawyer testified that they were unsure what the understanding was in this regard. Based upon the testimony of Toulon, which the jury could believe, and the reasonable inferences to be drawn therefrom, there is sufficient credible evidence to sustain the jury finding.

Question number five of the special verdict inquired whether the agreement was subsequently amended so as

to permit Toulon to exercise the option for 50 percent of the stock even though he had not made a timely tender of his initially required $10,000 investment. Nagle contends that his offer of a written stock option agreement, which was rejected by Toulon in December, 1967, shows that there was no agreement as to a modification of the original agreement.

Toulon testified that he rejected the proposed stock option agreement for the precise reason that it did not comply with the terms of the parties' original agreement. He also testified that when he told Nagle in January, 1967, that he would not be able to make his initial investment, Nagle told him to get it in the sooner the better. Nagle himself stated that up until March 2, 1968, he would have been satisfied if Toulon had come up with the remaining $5,000 of Toulon's initial investment. That day was the day of the proposed meeting for selling 50 percent of the stock to Toulon, a meeting which was not held because Nagle discharged Toulon. There is no evidence in the record that Nagle at any time informed or demanded that Toulon put up his $10,000 or their business arrangements would terminate.

There is sufficient evidence of an amendment to the agreement making timely tender of Toulon's initial investment nonessential to the exercise of the stock option to support the finding of the jury.

Question six of the special verdict inquired whether Toulon was ready, willing and able, and did he make a bona fide and timely offer to purchase the option stock. The jury also answered this question in the affirmative. Nagle asserts that the evidence showed that Toulon was not able to purchase the stock on March 5, 1968, nor was his offer bona fide.

Toulon testified that Whitehill was prepared to loan him the money for the purchase on the day in question. In fact, Whitehill had loaned Toulon part of the $5,000

in September, 1967, with which Toulon made his initial stock purchase. Whitehill testified that he was prepared to make the loan if Toulon's offer was accepted. The money was to be supplied by the immediate execution of a cashier's check to be drawn on a local bank. Dudley Davis, Toulon's lawyer who was at the meeting of March 5, 1968, testified that Toulon had his checkbook in front of him. Robert Downs, vice-president of VW, who was also present at the March 5, 1968, meeting, had testified at the trial of *Nagle Motors v. Volkswagen N.C. Distributor*. Part of that testimony was introduced at this trial. In that testimony Downs indicated that Toulon had a check ready for payment when the exercise of the option was tendered. Every witness to the tender testified that the offer was summarily rejected by Nagle.

The evidence was sufficient to sustain the finding of the jury.

Question number seven inquired of the jury what money damages were sustained by Toulon for his loss of the benefit of the agreement. The jury answered the question $56,761, with one dissenting juror who believed that it should have been $99,261.

Nagle's position, reduced to its essentials, is that there is insufficient evidence in the record to show that Toulon suffered any damage on account of the alleged breach.

Toulon asserts that the court can reduce damages awarded by a jury verdict only in the case of liquidated damages. *Koepke v. Miller* (1942), 241 Wis. 501, 6 N. W. 2d 670. This rule recognizes that the determination of damages normally involves a question of fact, properly within the province of the jury, and that a court which decides the issue, deprives the person of his constitutional right to a jury trial. *Campbell v. Sutliff* (1927), 193 Wis. 370, 214 N. W. 374. The rule does not prohibit a court from reducing an excessive verdict if an option for a new trial on the issue is provided. *Powers v. All-*

*state Ins. Co., supra; Campbell v. Sutliff, supra.* Moreover, when the question raised is whether there is sufficient evidence to sustain any damages, and not whether the damages are excessive, the constitutional question is not raised. The issue is whether the evidence is insufficient as a matter of law.

Nagle relies on the fact that the corporation had certain cash needs which had to be met before any profits could be distributed to the shareholders. Thus, the corporation was indebted to Nagle in the amount of $60,500. The 1968 objectives for the dealership showed a cash need in order to meet its dealer objective requirements.

The respondent's argument falls short of showing a lack of evidence of any damages. The fact that any profits made would not be distributed but rather had to be used to pay the outstanding loans of the corporation, does not reduce the benefit to be derived from the profits. It affects the form in which the benefit is received by the shareholders.

There was sufficient evidence to sustain the findings of the jury that the appellant was damaged by the breach of the agreement in question.

Our independent review of the record leads us to conclude that there was sufficient credible evidence to sustain each of the jury's answers against the challenges made by Nagle on the cross appeal. With the exception of the challenge to the amount of the damages, we conclude that there would be no probable miscarriage of justice if the jury's verdict was permitted to stand.

### *Judgment notwithstanding the verdict.*

A motion for judgment notwithstanding the verdict admits for the purposes of the motion that the findings of the verdict are true, but asserts that judgment should be granted the moving party on grounds other than those

decided by the jury. *Hennington v. Valuch* (1965), 27 Wis. 2d 130, 133 N. W. 2d 824; *Shumway v. Milwaukee Athletic Club* (1945), 247 Wis. 393, 20 N. W. 2d 123; *Volland v. McGee* (1941), 236 Wis. 358, 294 N. W. 497, 295 N. W. 635. Nagle asserts three grounds as a basis for granting a motion for judgment notwithstanding a verdict in this case.

*Statute of frauds.*

Nagle asserts that the agreement found by the jury to have been made in 1964, was an oral agreement upon which recovery cannot be had under the statute of frauds. Toulon, while conceding that the agreement was oral, contends that there was sufficient part performance of the agreement to take it out of the statute of frauds.

The parties concede that as to the original agreement, the applicable statute of frauds is that contained in sec. 121.04, Stats. 1963, which provides in relevant part:

"121.04 **Statute of frauds.** (1) A contract to sell or a sale of any goods or choses in action of the value of fifty dollars or upwards shall not be enforceable by action unless the buyer shall accept part of the goods or choses in action so contracted to be sold or sold, and actually receive the same, or give something in earnest to bind the contract, or in part payment, or unless some note or memorandum in writing of the contract or sale be signed by the party to be charged or his agent in that behalf."

This court, in *Conway v. Marachowsky* (1952), 262 Wis. 540, 55 N. W. 2d 909, construed the term "payment" in that statute to include services performed by a person entitled, upon rendition of those services, to obtain 50 percent of the stock of a certain corporation under an oral agreement. In the present case, one of the terms of the oral agreement was that Toulon devote his efforts to the establishment of the dealership. In return for these efforts he was to receive $2,500 worth of stock as a

finder's fee. In *Conway,* the plaintiff was to develop and form the corporation and continue to render services to the corporation in consideration of the full amount of stock to be received.

Nagle would distinguish the *Conway Case* on the basis that the statute of frauds question in that case was irrelevant to the decision as the complaint of the plaintiff was based on *quantum meruit.*

Regardless of whether *Conway* is distinguishable from the present case on the asserted basis, the part-performance doctrine is applicable to the present case. The doctrine requires that there be such conduct on the part of the parties in performance of the oral contract that to hold it invalid as violating the statute of frauds would itself work a fraud or hardship. *Bunbury v. Krauss* (1969), 41 Wis. 2d 522, 532, 164 N. W. 2d 473. The performance must be exclusively referable to the oral contract or be performance which is reasonably to be anticipated in reliance on the contract. *Bunbury v. Krauss, supra,* page 534; *Pick Foundry, Inc. v. General Door Mfg. Co.* (1952), 262 Wis. 311, 322, 55 N. W. 2d 407. The part-performance doctrine is not a substitute for proof of the terms of the alleged contract, but is a doctrine closely resembling estoppel designed in part to prevent an injustice when the person by his performance has changed his position to his own detriment to the extent that an injustice would be done by permitting an invocation of the statute of frauds. *Bunbury v. Krauss, supra,* page 534; *Pick Foundry, Inc. v. General Door Mfg. Co., supra,* pages 322, 323.

In the present case there has been considerable performance exclusively referable to the contract or reasonably to have been anticipated in reliance on the contract by both parties. Toulon devoted substantial amounts of time setting up the dealership including hiring prospective employees, attending meetings which required the expenditure of $1,500 of his own money, leaving full-time

employment and taking part-time employment so as to devote more time to the development of the dealership with a concomitant reduction in his salary. Toulon also invested $5,000 in the company, although sometime after the time specified in the initial agreement. Nagle, for his part, invested substantial sums in the business, including meeting the requirement of purchasing land, constructing a building and leasing it to the corporation.

The trial court found that there was part performance of a single, integrated contract as of June, 1965, when the VW letter of intent was issued. While we vacate the order of the trial court, we agree with this finding. Some of the performance noted above postdated that letter and thus served as an additional basis for finding that there was part performance which would make it inequitable to now hold that the agreement is unenforceable because of the statute of frauds.

Nagle next contends that the amendment to the oral contract also fails to fulfill the requirements of the statute of frauds and is unenforceable. The jury found that the original agreement was made in 1964. No finding was made as to the date of the amendment waiving the initial time requirement as to when Toulon should make his $10,000 investment. It is argued that it must have postdated the stock subscription agreement of January 4, 1967, or at least the formation of the corporation in May, 1966, and thus the amendment occurred after the effective date of the Uniform Commercial Code (July 1, 1965). It is, therefore, argued by Nagle that the amendment is governed by sec. 401.110 (1) (a), Stats.

Sec. 401.110 (1) (a), Stats., by its terms makes no provision for a part-performance rule other than where delivery of the security has been accepted or payment has been made, and then only to the extent of the delivery or payment.

Toulon contends that the transition provision of the Uniform Commercial Code, sec. 401.110, Stats., continues

in effect the law in existence at the time of the agreement as the law governing that agreement. Sec. 401.110 provides in relevant portion:

"401.110 **Effective date; provision for transition.** (1) This code applies to transactions entered into and events occurring on and after July 1, 1965.

"(a) Transactions validly entered into before July 1, 1965, and the rights, duties and interests flowing from them remain valid thereafter and may be terminated, completed, consummated or enforced as required or permitted by any statute amended or repealed by chapter 158, laws of 1963, as though such repeal or amendment had not occurred."

This section is a provision unique to the codes of Wisconsin and Nevada and has not been construed by either court. We are of the opinion, if an agreement can be terminated, completed, consummated or enforced under the provisions of the law applicable at the time of its formation, that it would be an unreasonable construction of the statute to hold that the agreement could not be so modified or amended as to provide for the same. The amendment of the original agreement is subject to the same statutory rules of part performance applicable to the original agreement.

Nagle seeks to isolate the part performance of Toulon in making a late tender of his investment in the corporation and the acceptance thereof by the corporation, by interposing the corporate veil. Thus it is contended that the tender of $5,000 and receipt of stock therefor in the fall of 1967, some ten months after the investment should have been made, is referable only to an amendment of the stock subscription agreement between Toulon, Nagle, and the corporation, and not an amendment to the oral agreement between Toulon and Nagle.

We do not regard such an attempt to isolate acts of performance as meritorious. At the time of the stock subscription agreement, and under its provisions, Nagle and Toulon were to be the only shareholders of the corpora-

tion. The stock subscription agreement, which incorporated some, but not all, of the terms of the oral agreement between the parties to this appeal, affected the rights of no one beside the two prospective shareholders and the corporation which they were to own. Under such circumstances, the corporate veil should be pierced for the purposes of recognizing that the late tender by Toulon of $5,000, was performance referable to an amendment to the original oral agreement, partially embodied in the stock subscription agreement. As such, there has been part performance pursuant to the orally amended agreement between the parties, taking the amendment out of the statute of frauds.

Nagle also raises issues relating to his purported rights to rescind the contract because Toulon did not timely meet his investment commitments. Nagle asserts this failure of Toulon was either a material breach of the contract or a renunciation of it by Toulon. From our review of the record and because the findings of the jury are supported by credible evidence, we find these arguments to be without substance. Nagle also advances the argument that the trial court erred in improperly admitting parol evidence concerning the agreements between himself and Toulon.[1] As we view this record the trial court did not commit error in this regard.

We are of opinion that none of the issues raised by Nagle's motion for judgment notwithstanding the verdict warrant overturning the jury's verdict as a probable miscarriage of justice.

We now consider the issue of whether the damage award of the jury was excessive.

*New trial on damages.*

The jury awarded Toulon damages in the amount of $56,761. Our independent review of the record leads us

---

[1] *See: Bunbury v. Krauss, supra.*

to conclude that there is no credible evidence in the record to support such a finding and that there would be a probable miscarriage of justice if the jury's verdict as to the amount of damages was permitted to stand.

The jury could have speculated that the dealership would generate substantial future profits over a period of years if Toulon and Nagle both participated on an amicable and cooperative basis. However, because of the personal antagonisms between the parties and the dependence of Toulon on Nagle to meet the growing cash needs and capital requirements of the business, there is no credible evidence and no evidence from which a reasonable inference could be drawn that these two parties could continue to operate the business profitably and successfully.

There was a dispute in the evidence as to the amount of additional capital necessary to keep the dealership going as a profitable venture. The 1968 dealer objectives, which set performance goals for the dealership for that year, showed a need for additional cash to meet those goals. McGann and Toulon both testified at one point that under the objectives a total additional investment of $63,000 was necessary. At another point in his testimony, McGann indicated that a loan of $35,500 would be sufficient to reach the objectives which, in his opinion, would make it probable that the dealership would make, after tax, profits for that year in the amount of $20,000. Presumably only the lesser amount was required because the loan could be used to offset the goals for both "cash and equivalent" and "working capital."

There is substantial credible evidence that VW had constantly increased the capital necessary to start a dealership from $50,000 in 1961, to $70,000 in 1965, to $79,000 in 1967. As the volume of the dealer's business increased, so too did the need for additional cash and equivalent and working capital, as the 1968 dealer objec-

tives show. This money had to come either from outside investment or by internal generation from the earning of profits. The evidence showed that Toulon was almost totally dependent on Nagle in this regard. While Whitehill testified that he was willing to loan $40,000 to Toulon, $17,500 of this would have been for the purchase of the stock. Moreover, Nagle had loaned $40,500 to the corporation on demand notes, which could have been called at any time, and he had made the additional loan of $20,000 which was payable out of the corporate profits after January 1, 1969. Thus, the evidence established that Nagle, had he wished, could have withdrawn his former loans or could have refused to loan additional money. Either action would have effectively prevented the business from continuing.

The probability of what Nagle would have done had Toulon become a 50 percent shareholder in the corporation relates directly to the question of the personal antagonisms between the parties. We believe the evidence undeniably establishes that the parties could no longer get along sufficiently well to continue in business together. Toulon contends that it would be unreasonable to assume that Nagle would continue his unwillingness to reconcile or that he would call his loans to the corporation, as either would result to Nagle's detriment. On the other hand, Nagle testified that he knew when he discharged Toulon that he risked losing the franchise of VW, but he was willing to take that risk.

The record in this case is replete with evidence that Toulon and Nagle had almost constant disagreement concerning the management and financing of the dealership. These disagreements were the concern of VW and substantially affected the relationship of the dealership with VW. In discussing the items of profit as an element of damages in a business operation, 5 Corbin, *Contracts*, pp. 147, 150, sec. 1023, states: "In each case the courts must

consider the number of possible contingencies and the probability of their occurrence." In this case they are numerous.

It is our judgment that the jury award of damages is excessive and that the evidence will not support it. We are of the further opinion that it was not due to perversity or prejudice and is not the result of error occurring during the trial.

We were obliged to find the order of the trial court relating to the postverdict motions of Nagle void and ineffective because of the provisions of sec. 270.49, Stats. However, in that order the trial court found that the evidence reasonably supported a verdict of $15,000, together with costs and interest from the date of the verdict. Our independent review of the record leads us to the same conclusion. There is credible evidence that the profits for 1967 were approximately $14,500. McGann testified that 1968 profits would be approximately $20,000 based upon the dealership meeting its 1968 dealer objectives. Under our view of facts in this record, any attempt to calculate damages beyond 1968 would be most uncertain and wholly speculative. Toulon also sold his stock back to the corporation at a profit of $3,800. Fifty percent of the profits for these two years, adjusted for Toulon's profit in the sale of his stock, is approximately $15,000.

It is our judgment that the evidence reasonably supports a verdict of not to exceed $15,000.

On the facts in this case, we conclude the interest of justice will be served by giving Toulon, the plaintiff-appellant, the option to remit $41,761 of the damages as determined by the jury within twenty days after remittitur and, in the event he fails to so elect, Nagle, the defendant-respondent, is awarded a new trial limited to the issue of damages.[2]

[2] *Naden v. Johnson* (1973), 61 Wis. 2d 375, 212 N. W. 2d 585.

The request of respondent Nagle to strike certain statements in the brief of appellant Toulon is denied.

*By the Court.*—Order reversed and cause remanded with directions to enter a proper order for new trial with an option to plaintiff-appellant to accept judgment in a reduced amount in lieu thereof in accordance with this opinion.

DAY, J., took no part.