MILWAUKEE RESCUE MISSION, INC., a domestic non-profit corporation, Plaintiff-Respondent-Petitioner,

v.

REDEVELOPMENT AUTHORITY OF the CITY OF MILWAUKEE, a municipal corporation of the State of Wisconsin, Defendant-Appellant.†

Supreme Court

*No. 89-0610. Argued February 26, 1991.—Decided May 1, 1991.*

(Also reported in 468 N.W.2d 663.)

†Motion for reconsideration denied.

473

For the plaintiff-respondent-petitioner there was a brief by *Paul C. Konnor* and *Konnor, Spheeris & Konnor,* Milwaukee and *Benjamin Southwick,* Richland Center and oral argument by *Benjamin Southwick.*

For the defendant-appellant there was a brief by *Scott G. Thomas,* assistant city attorney, *Charles R. Theis,* special deputy city attorney and *Grant F. Langley,* city attorney, Milwaukee and oral argument by *Grant F. Langley.*

CALLOW, WILLIAM G., J.   This is a review of an unpublished decision of the court of appeals filed February 21, 1990 which reversed and remanded an order of the Circuit Court for Milwaukee County, Judge Victor Manian. The circuit court granted judgment on the jury's verdict that the plaintiff-respondent-petitioner's (Milwaukee Rescue Mission, Inc.'s) real estate had a fair market value of $2,100,000. This case is before this court for review and determination pursuant to sec. (Rule) 809.62, Stats.

There are three issues in this case: (1) Did the circuit court abuse its discretion when it granted judgment on the jury verdict, on the ground that the jury verdict was not supported by credible evidence?; (2) Did the circuit court abuse its discretion by prohibiting one of the defendant-appellant's (Redevelopment Authority of the City of Milwaukee's) expert witnesses from testifying?; and (3) Did the circuit court abuse its discretion by awarding contingent attorney fees of $378,467.15 to the Milwaukee Rescue Mission, Inc. (Rescue Mission)? We

first conclude that the circuit court did not abuse its discretion in granting judgment on the jury verdict. We conclude that there was credible evidence on the record to support the jury's finding that the Rescue Mission's property had a fair market value of $2,100,000. Next, we conclude that the circuit court did not abuse its discretion by prohibiting the Redevelopment Authority of the City of Milwaukee (Redevelopment Authority) from presenting the testimony of one of its expert witnesses because this would prejudice the Rescue Mission's case. We finally conclude that the circuit court did not abuse its discretion in awarding contingent attorney fees of $378,467.15 to the Rescue Mission. The circuit court properly exercised its discretion when it determined that, based on the facts of this case, the award was reasonable.

The relevant facts follow. The Redevelopment Authority exercised its power of eminent domain in acquiring property owned by the Rescue Mission on June 25, 1986. This property consisted of a lot and a four-story building. The building had been constructed in 1910 to provide food, shelter and clothing to homeless men. Its floor area measured 37,849 square feet, and it had a concrete rather than a steel frame. Between 1978 and 1981, the building was remodeled and renovated at a cost of approximately $750,000.

The Redevelopment Authority acquired the Rescue Mission's property for $1,091,000, by recording an award of damages with the Register of Deeds of Milwaukee County on June 25, 1986, pursuant to sec. 32.05(7)(c), Stats. 1985–86.[1] The Rescue Mission appealed the

---

[1] Section 32.05(7)(c), Stats. 1985–86, provides:

When service of the award has been completed, and after payment of the award as provided in par. (d), the award shall be recorded in the office of the register of deeds of the county wherein the property is

amount of compensation directly to the Circuit Court of Milwaukee County, pursuant to sec. 32.05(11).[2] The case was tried to a jury, which found the fair market value of the property to be $2,100,000 as of the date of taking.

At trial, each party presented one real estate appraisal expert who testified as to the fair market value of the property: David Peltin for the Rescue Mission, and Arthur Washa for the Redevelopment Authority. Although the Redevelopment Authority did not originally list Curt Olson as an expert witness to be called at trial, it later moved to allow it to call him as an additional real estate appraisal expert. The circuit court denied this motion on the ground that it would unfairly prejudice the Rescue Mission's case.

Both Peltin and Washa agreed that the Mission was a "special use property," built for a specific purpose and not easily convertible to other uses. For this reason, they both used a "cost approach" to appraising the property. In applying the cost approach, these appraisers determined that the fair market value of the property was equal to: (1) the value of the land as if vacant, plus (2)

located. Thereupon title in fee simple to the property described in the award, or the lesser right in property acquired by the award shall vest in the condemnor as of the time of recording. The date of such recording is the "date of evaluation" and also the "date of taking."

Pursuant to this section, June 25, 1986 was the "date of evaluation" and the "date of taking."

[2]Section 32.05(11), Stats. 1985–86, provides, in part:

WAIVER OF HEARING BEFORE COMMISSION; APPEAL TO CIRCUIT COURT AND JURY. The owner of any interest in the property condemned named in the basic award may elect to waive the appeal procedure specified in sub. (9) and instead, within 2 years after the date of taking, appeal to the circuit court of the county wherein the property is located. . . . The sole issues to be tried shall be questions of title, if any, under ss. 32.11 and 32.12 and the amount of just compensation to be paid by condemnor.

the cost of a replacement model of the building, minus (3) any depreciation applicable to the building, plus (4) the value of the existing fixtures and equipment. Using this appraisal technique, Peltin testified that the fair market value of the property was either $1,356,100 or $1,536,000, depending on the rate of depreciation. Washa testified that the fair market value of the property was $1,074,395. Both experts reached their estimates of replacement cost (step 2) based upon the use of a steel frame rather than a concrete frame, although the original building had been built with a concrete frame.

The Rescue Mission also presented testimony of three other non-appraiser expert witnesses: an architect, a structural engineer and the owner of a construction firm, Thomas Cecchini. These witnesses testified that a concrete frame building had advantages over a steel frame building. Cecchini also testified that the cost of replacing the building with a concrete frame would be approximately $3,490,195, compared to replacing the building with a steel frame at a cost of $2,280,453. Cecchini did not offer an estimate of the fair market value of the property.

Based on evidence presented at trial, the jury determined that the fair market value of the property at the time of taking was $2,100,000. This represented an increase of $1,009,000 over the compensation originally paid to the Rescue Mission ($2,100,000 minus $1,091,000). Based on this verdict, the circuit court ordered the Redevelopment Authority to pay $1,559,746.39 to the Rescue Mission, which included litigation expenses and statutory interest. On appeal, the court of appeals reversed and remanded this case on the ground that the jury verdict exceeded the property's fair market value and was not supported by credible evidence. Rescue Mission petitioned this court for review

pursuant to sec. (Rule) 809.62, Stats., and we have accepted this case for review and determination.

## I.

A first step in addressing whether the circuit court abused its discretion in granting judgment on the jury award is to determine what constitutes an abuse of discretion in such a case. In this case, the jury returned a special verdict setting $2,100,000 as the fair market value of the Rescue Mission property. In such a case, the test for determining whether this verdict should be changed is to view the evidence in the light most favorable to the verdict, and to sustain the verdict if it is supported by any credible evidence. *Nelson v. Travelers Ins. Co.,* 80 Wis. 2d 272, 282–83, 259 N.W.2d 48 (1977). This standard especially applies to reviewing courts, where the verdict has the approval of the circuit court. *Toulon v. Nagle,* 67 Wis. 2d 233, 242, 226 N.W.2d 480 (1975). The credibility of witnesses and the weight given to their testimony are matters for the jury's judgment and if more than one inference can be drawn from the evidence presented, we will accept the inference drawn by the jury. *See id.*

This court stated in *Besnah v. Fond du Lac,* "the finding of a jury as to valuation in a condemnation case, approved by the trial court, will not be disturbed on review where it is clear that the value arrived at is well within the range of values placed in evidence, and where there is credible evidence to sustain the jury's finding." *Besnah,* 35 Wis. 2d 755, 759, 151 N.W.2d 725 (1967) (citing *Weeden v. Beloit,* 29 Wis. 2d 662, 669, 139 N.W.2d 616 (1966)). Several cases illustrate how this rule has been applied. In *Hurkman v. State,* also an eminent domain case, we concluded that evidence of

480

comparable sales was credible evidence, and could be used to establish a range of values, along with testimony of fair market values given by appraisal experts. *Hurkman,* 24 Wis. 2d 634, 130 N.W.2d 244 (1964). In another case, *Genge v. City of Baraboo,* the jury was asked to determine a fair market value of both the before-taking value of the property and the after-taking value of the property. In that case, we held that the jury could not pick and choose between the before-taking and after-taking values determined by different appraisal experts, to arrive at an award based on the difference between these amounts, when the difference exceeded the range of differences established by the appraisal experts. *Genge,* 72 Wis. 2d 531, 241 N.W.2d 183 (1976).

Credible evidence as to property values is not limited to testimony of witnesses who have technical expertise, but the witness should have knowledge of the value standards with respect to the type of land involved, in order to offer his or her appraisal of value to the jury.[3] Such testimony constitutes credible evidence along with that offered by appraisal experts, and may be considered in setting the parameters of the jury's verdict.

With these principles in mind, we examine whether the jury's verdict was based on credible evidence, and if the circuit court abused its discretion by granting judgment on the verdict.

Private property may not be taken for public use, unless the owner receives just compensation. U.S. Const. amend. V; Wis. Const. art. I, sec. 13. In determining "just compensation" in eminent domain proceedings, the condemnor (Redevelopment Authority) must pay the fair market value of the property taken when the entire

[3] 5 J. Sackman, *Nichols' The Law of Eminent Domain,* sec. 23.04 (3rd ed. 1990).

property is taken by the condemnor. Section 32.09(5)(a), Stats. We have defined "fair market value" as that amount which can be realized on sale by an owner willing, but not compelled to sell to a purchaser willing and able, but not obliged to buy. *P.C. Monday Tea Co. v. Milwaukee County Expressway Comm'n,* 24 Wis. 2d 107, 112-13, 128 N.W.2d 611 (1964). Occasionally, property is of such a unique nature that, while it serves a useful purpose to its owner, the owner is unable to sell it at anything near its value to the owner. While these types of properties (e.g., schools, churches) have great value to their owners, they are not the type normally bought and sold on the open market. Such a property is a "special use property." 4 Sackman, *supra,* sec. 12C.01[1]. The market value of such properties cannot be determined in the ordinary manner, since market value presupposes a willing buyer and a willing seller, and neither exists in such a case. *Id.*

Several valuation techniques have been used in ascertaining the fair market value of condemned properties. 4 Sackman, *supra,* sec. 12C.01[3]. One of these techniques, the cost approach, is useful in determining the fair market value of special use properties. *Id.* at sec. 12C.01[3][b]. Basically, under this approach the replacement[4] or reproduction[5] costs, minus depreciation may be used to determine the fair market value.

Peltin testified that the Rescue Mission property was a special purpose facility. Both Washa and Peltin agreed that the cost approach was the proper approach to use in valuing this property, and both agreed that the

[4] "Replacement" cost represents the cost to rebuild the property so that the new facility has utility equivalent to the property being valued. 4 Sackman, *supra,* sec. 12C.01[3][b] n.91.

[5] "Reproduction" cost represents the cost to rebuild an identical facility or replica. 4 Sackman, *supra,* sec. 12C.01[3][b] n.91.

replacement cost rather than the reproduction cost was the appropriate standard to use. Both appraisers agreed that the cost approach method to determining fair market value consisted of four steps; although they disagreed as to the figures to be used at each step:

| Cost Approach | Washa | Peltin |
|---|---|---|
| Value of the Land as if Vacant | $74,000 | $90,000 |
| Cost of a New Replacement Building | $1,464,000 | $2,269,000 |
| Applicable Depreciation of the Existing Building | 44% (approx.) | 45% |
| Value of Existing Fixtures and Equipment | $174,395 | $198,000 |
| Fair Market Value of Property | $1,074,395 | $1,536,000 |

Based on the testimony of these appraisers, it is clear that the general notion of fair market value as what a willing buyer would pay for the property and a willing seller would sell the property for is inapplicable.[6] Both

[6]The Redevelopment Authority argues that in building a replacement building, certain materials should not be utilized if they do not affect what a willing buyer would pay for the building. In other words, the Redevelopment Authority argues that a concrete frame should not be used in determining the fair market value of a replacement building, because a building with a concrete frame is worth no more to a willing buyer than a steel frame. Such an argument is erroneous in light of the fact that the cost

appraisers utilized a steel frame model in arriving at a "cost of replacement" total.

Cecchini, the construction firm owner, testified about the cost of a replacement building. He testified that in his opinion it would cost $2,280,453 to build a replacement model using a steel frame. He also testified, without objection, that a replacement building could be built with a concrete frame at a cost of $3,490,195, although he did not recommend using such a frame (presumably due to the significantly higher cost). While the jury award of $2,100,000 exceeded the fair market value ranges of both the appraisal experts (Peltin and Washa), the Rescue Mission argues that Cecchini's testimony concerning the cost of the concrete frame was credible evidence to support the jury award, because, when used in the cost approach equation, it established an upper fair market value range of $2,207,607, which exceeded the jury award. We agree that Cecchini's testimony concerning the concrete frame was credible evidence.

Cecchini was a competent witness because he had knowledge of building costs beyond that possessed by persons in general. *See* 5 Sackman, *supra,* sec. 23.02. He was a building contractor, well acquainted with the costs of such buildings. While he was not an appraiser, he was competent to render an opinion about the cost of replacing the building.

If the record had established that there were no functional differences between a steel and a concrete frame, the Redevelopment Authority could properly

approach in this case was used primarily because mission buildings do not generally have a market of willing buyers. Because the cost approach must be used to determine the fair market value of this property, the question of what a willing buyer would pay for such a property is not an appropriate question.

argue that steel was "state-of-the-art," and a concrete frame may be unjustified in determining the cost of replacement. Several witnesses testified, however, that there were distinct advantages to using a concrete frame over a steel frame, so the jury was justified in concluding that the Rescue Mission was entitled to a replacement building with a concrete frame. In this case, witnesses testified that a building with a concrete frame: (a) would last longer, (b) was more fire resistant, and (c) required less maintenance than a building with a steel frame. Under these circumstances, the jury could properly conclude that the replacement cost included the cost of a concrete frame. Although the cost may have been significantly higher than a steel frame, this fact alone does not render the jury's verdict incredible as a matter of law.

The jury was entitled to insert Cecchini's concrete replacement figure in arriving at its verdict. The Redevelopment Authority argues, without case law support, that the jury should not be allowed to insert the replacement cost into the four-step cost approach, because "cost" is not synonymous with "fair market value." We conclude that the jury has the discretion to insert a cost of replacement figure into the cost approach to arrive at its own fair market value of the property. Although we have not addressed this question directly, we have recognized the jury's discretion to consider factors underlying an expert's opinion on fair market value (*see Volbrecht v. State Highway Comm'n,* 31 Wis. 2d 640, 645, 143 N.W.2d 429 (1966); *Herro v. Department of Natural Resources,* 67 Wis. 2d 407, 420–21, 227 N.W.2d 456 (1975)). We have also held that testimony of a building expert concerning nonconforming use of a property could also be considered by the jury in determining just compensation in an eminent domain case. *Loeb v. Board*

*of Regents,* 29 Wis. 2d 159, 166, 138 N.W.2d 227 (1965). In light of these precedents, we conclude that the jury is not limited to considering only the ultimate opinions of expert appraisers as to fair market value, but should consider and weigh all evidence in reaching its verdict.

In *Hurkman,* an eminent domain case involving farmland, expert appraiser testimony about the before-taking value of the land provided amounts ranging from $125,000 to $245,000, and the testimony about the after-taking value of the land provided amounts ranging from $107,350 to $154,000. *Hurkman,* 24 Wis. 2d at 636–37. Although he did not base his appraisal estimate on comparable sales figures, one expert also testified that comparable property sales in preceding years had ranged from $5,950 to $36,000. This court reversed the circuit court's order setting aside a jury verdict which found the before-taking value of the property to be $135,000 and the after-taking value to be $85,500. *Id.* at 639. We found that the comparable sales testimony was credible evidence to sustain the findings of the jury, even though the after-taking value was below the range established by the testimony of the appraisal experts. We stated: "proper evidence of comparable sales can be of substantial aid to the jury in the performance of its obligation to find the true value." *Id.* at 641–42. Here, as in *Hurkman,* the jury should not be limited to the range of fair market values supplied by appraisal experts.

The Redevelopment Authority, nonetheless contends that *Genge* controls the outcome of this case. *Genge,* 72 Wis. 2d 531. In *Genge,* the City of Baraboo took by condemnation 11.73 acres of Genge's land to provide a clear zone at the end of an airport runway. Expert witnesses testified to the following before- and after-taking values of the property: $24,000/$19,400; $22,000/$19,500; $20,000/$15,500; $39,550/$38,450. *Id.*

at 532–33. The differences in before- and after-taking values of the property, therefore, ranged from $1,100 to $4,600. The jury awarded damages of $7,995, based on its determination that the property was worth $28,500 before taking and $20,505 after taking. *Id.* at 533. We affirmed the circuit court's finding that the award was excessive because it was not within the range of differences established by the expert testimony.

*Genge* does not control the outcome of this case for several reasons. First, *Genge* involved the comparison of before- and after-taking values as independently determined by appraisal experts. Presumably, each expert used the same principles and assumptions to arrive at his estimate of both before- and after-taking values. Because these principles and assumptions may not have been uniform between experts, it is not appropriate to compare a before-taking value of one expert with an after-taking value of another. In this case, by contrast, the jury award was based only on the before-taking fair market value. The award was ultimately based upon the cost approach approved by both expert appraisers.

Secondly, the *Genge* decision cannot be broadly applied in light of *Hurkman.* In *Hurkman,* this court could have held that the jury verdict was outside the range of credible evidence, as the expert did not use evidence of comparable sales in arriving at his estimated fair market values.[7] We stated, however, that "[i]f the jury considered the evidence of comparable sales in fixing upon a before-taking value, it probably considered the same evidence in determining the after-taking value." *Hurkman,* 24 Wis. 2d at 642. This court did not intend that a rigid rule concerning ranges of expert testi-

---

[7]The *Genge* court distinguished *Hurkman* on the ground that comparable sales values were at issue in *Hurkman* but were not a factor in *Genge. Genge,* 72 Wis. 2d at 535.

mony be applied, but rather that when before- and after-taking values were compared, equivalent principles and assumptions should be applied.

Finally, a narrow reading of *Genge* conflicts with other principles of jury discretion. The jury is obligated to consider all credible evidence and make reasonable inferences from the evidence in reaching its decision on a special verdict. Section 805.14(1), Stats.[8] Unlike the jury in *Genge,* in this case the jury drew a reasonable inference from the evidence presented. The jury determined that there was credible evidence to justify utilizing a concrete frame in the cost of replacement of the mission building, and inferred from this evidence that the fair market value of such a replacement would be approximately $2,207,000. Since the jury was not precluded from considering the cost of the concrete frame, such an inference is reasonable, and places the jury's final verdict within the high and low ranges supported by the evidence. The circuit court judge recognized that the jury had an obligation to consider all credible evidence when he stated: "[i]t is your duty to take into consideration all of the elements and factors that have entered into the question of fair market value, all that contribute to make the property valuable, as well as all that detract from it, if any: and finally, weighing all the elements and all of the factors as they may appear from

[8]Section 805.14(1), Stats., provides:

TEST OF SUFFICIENCY OF EVIDENCE. No motion challenging the sufficiency of the evidence as a matter of law to support a verdict, or an answer in a verdict, shall be granted unless the court is satisfied that, considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such party.

the evidence, determine what is the fair market value for the single property in question as a composite unit."

The Redevelopment Authority contends that the jury could not properly consider the cost of a reproduction of the Rescue Mission property, because the experts agreed, and the jury was instructed that replacement cost was the proper standard. The Redevelopment Authority further contends that a building with a concrete frame is a reproduction and not a replacement, arguing that even Cecchini characterized it as such. We disagree. Although Cecchini did admit that he would not recommend a building such as this with a concrete frame, he did not state that such a building would be a "reproduction." On direct examination, he was asked: "Did you make an analysis of how much it would cost to build a replacement building of the mission property with a concrete frame?" Cecchini replied, "Yes, we did." Later, he testified that if he were to build a similar concrete building, he would not be able to reproduce the original 1910 building because materials used then were not available in 1986. He indicated that his concrete replacement would utilize state-of-the-art techniques to produce a building similar, but not identical to the original building.

On cross-examination, the Redevelopment Authority attorney attempted to characterize Cecchini's concrete building as a reproduction. Although at one point Cecchini did agree, after repeated questioning, that his figures were based on a reproduction or replication technique, he later admitted to being confused by the attorney's use of the terms "reproduction" and "replacement." In response to the attorney's characterization of the steel frame building as a "reproduction," he stated: "[w]e've used all the state of the art and the modern

techniques and equipment and material in the new version of the Rescue Mission building. It's not a reproduction." Cecchini testified that although the new building would have the same floor plan and function, it would be designed differently. Based on the testimony of Cecchini, it was reasonable for the jury to conclude that the replacement cost of the building was the cost testified to by Cecchini, and could properly include a concrete frame.

## II.

The next issue we address is whether the circuit court properly denied the Redevelopment Authority's motion to amend the scheduling order and permit it to call an additional expert witness, Curtis Olson, and its subsequent denial of the Redevelopment Authority's motion for a new trial based on this action. The court of appeals did not reach this issue in its decision.

The circuit court has the discretion to exclude the testimony of a witness if a party is prejudiced by the opposing counsel's failure to inform him of the intent to call that witness. *Fredrickson v. Louisville Ladder Co.,* 52 Wis. 2d 776, 782, 191 N.W.2d 193 (1971). The court's exercise of discretion will be upheld absent an abuse of discretion. *Johnson v. Johnson,* 78 Wis. 2d 137, 143–44, 254 N.W.2d 198 (1977). The court properly exercises its discretion when it examines the relevant facts, applies a proper standard of law and reaches a reasonable conclusion using a demonstrated rational process. *Loy v. Bunderson,* 107 Wis. 2d 400, 414–15, 320 N.W.2d 175 (1982).

The circuit court did not abuse its discretion in prohibiting the Redevelopment Authority from present-

ing the testimony of Olson. We reach this conclusion based on our determination that: (a) the record indicates that the circuit court considered the prejudice to the Rescue Mission of allowing Olson to testify, and the probative value of Olson's testimony was limited; and (b) while the circuit court could have granted a continuance, this would have led to an unreasonable delay in the trial. *See Fredrickson,* 52 Wis. 2d at 782–85.

The circuit court issued a scheduling order on June 5, 1987, pursuant to sec. 802.10(3)(b), Stats. This order included, among other things, a requirement that the parties file a complete list of witnesses (including experts) with the circuit court, by July 5, 1987. Originally, the action was scheduled for a jury trial to be conducted on July 25, 1988. Additionally, the order required that the parties exchange their real estate appraisal reports by September 20, 1987. The scheduling order indicated that failure to comply with the order "shall be considered cause for imposing sanctions which may include . . . orders limiting or barring the presentation of testimony or introduction of evidence at trial . . .."

The Redevelopment Authority named only Arthur Washa as an expert witness, even though it had also obtained an appraisal of the Rescue Mission property from Olson. Shortly before the trial date, the Rescue Mission made a motion in limine seeking to bar Washa from testifying on the ground that he was not an expert. The court took this motion under advisement.

On the first day of trial, October 31, 1988, the Redevelopment Authority moved to amend the scheduling order to allow it to present Olson's testimony, at least in part because of the possibility that Washa's testimony might be disallowed. The circuit court denied this

motion, but permitted Washa to testify without restrictions.

This court stated, in *Fredrickson,* that the trial court judge is allowed to: "exclude evidence if he finds that its probative value is outweighed by the risk that its admission will . . . unfairly surprise a party who has not had reasonable ground to anticipate that such evidence would be offered." *Fredrickson,* 52 Wis. 2d at 783 (quoting *Whitty v. State,* 34 Wis. 2d 278, 294, 149 N.W.2d 557 (1967)). In this case, the Rescue Mission had been aware of Olson's appraisal report, had deposed him, and in fact had reserved the right to call Olson and other contractors of the Redevelopment Authority. Nonetheless, the circuit court determined that the Rescue Mission would be prejudiced by the fact that adding a witness on the first day of trial would change the philosophy, direction and strategy of the lawsuit. The circuit court recognized that even though the Rescue Mission was aware of Olson, it would still have to respond to a different defense than it had prepared for or had anticipated.

The circuit court did not address the probative value of Olson's testimony. However, it did allow the Redevelopment Authority to include Olson's appraisal report under an Offer of Proof.[9] In his report, Olson also used the cost approach to arrive at his fair market value of $1,200,000. This figure is higher than Washa's assess-

[9]The circuit court did not fully apply the *Fredrickson* standard that the probative value be balanced against the risk of unfair surprise. However, since this matter rests within the discretion of the circuit court, we examine the record independently to determine if the record contains evidence to support the circuit court's decision. *See Schmid v. Olsen,* 111 Wis. 2d 228, 237, 330 N.W.2d 547 (1983). This examination of the evidence includes the Offer of Proof, which is reviewable as part of the record. *See* Cleary, *McCormick on Evidence,* sec. 51, 123–24 (3d ed. 1984).

ment of $1,074,395. Although this testimony may have had some probative value, in light of the fact that Washa was allowed to testify, and the fact that the motion was not made until the first day of trial, its probative value does not outweigh its prejudice to the Rescue Mission.

*Fredrickson* suggests that a preferred alternative to excluding the testimony of a witness is to continue the trial until the opposing party has had an opportunity to prepare for it. *Fredrickson,* 52 Wis. 2d at 784. This suggestion is based on "the policy of discovering all of the truth." *Id.* (citation omitted). The "truth" to be discovered here is not highly probative in value, and does not justify the conclusion that the circuit court abused its discretion in not granting a continuance.[10] The court recognized that the case had been pending for almost two years. Additionally, the court could not reschedule the case for over a year if it granted a continuance. In light of these facts, the circuit court did not abuse its discretion in refusing to allow the testimony of Olson.

### III.

The final issue is whether the circuit court abused its discretion in awarding attorney fees of $378,467.15[11]

---

[10]The Redevelopment Authority argues, in its supplemental reply brief, that Olson's testimony would not have been cumulative or a surprise to the Rescue Mission. While Olson's testimony may have had some probative value, it is insufficient to lead to a conclusion that the circuit court abused its discretion.

[11]The circuit court approved litigation expenses totaling $417,894.73. The attorney fee award of $378,467.15 is taken from the Rescue Mission's Memorandum Brief in support of its Motion for Litigation Expenses and represents one-third of the increase ($1,009,000) plus statutory interest accruing up to Febru-

based on a contingency fee agreement between the Rescue Mission and its counsel. The circuit court's determination of the value of attorney fees is a finding of fact, and it will be sustained unless there is an abuse of discretion. *Standard Theatres v. Transportation Dep't,* 118 Wis. 2d 730, 747, 349 N.W.2d 661 (1984). Additionally, the burden of proof is on the attorney submitting the fees to prove the reasonableness of the fees. *Id.* at 748 (citing *Disciplinary Proceedings Against Marine,* 82 Wis. 2d 602, 607, 264 N.W.2d 285 (1978)). We conclude that the circuit court did not abuse its discretion in awarding attorney fees in this case.

Section 32.28(3)(e), Stats., provides that in a condemnation action, if the jury verdict exceeds the jurisdictional offer by at least $700 and at least 15 percent (which it did in this case), the court shall award litigation expenses.[12] "Litigation expenses" include reasonable attorney fees. Section 32.28(1).[13]

---

ary 26, 1989. This amount is used for purposes of this opinion, although the actual award may vary depending on when it is paid. The difference between the total litigation expenses and the attorney fees represent witness fees and other miscellaneous legal expenses.

[12]Section 32.28(3)(e), Stats., provides:

    **(3)** In lieu of costs under ch. 814, the court shall award litigation expenses to the condemnee if:

    . . ..

    (e) The jury verdict as approved by the court under s. 32.05(11) exceeds the jurisdictional offer or the highest written offer prior to the jurisdictional offer by at least $700 and at least 15%.

[13]Section 32.28(1), Stats., provides:

**Costs. (1)** In this section, "litigation expenses" means the sum of the costs, disbursements and expenses, including reasonable attor-

The Rescue Mission employed two attorneys on this case, Paul Konnor and Benjamin Southwick. Konnor had served as counsel for the Rescue Mission for thirty years and had accepted a one-third contingency agreement to represent the Rescue Mission in this case. Southwick, an attorney experienced in eminent domain litigation, was originally hired by the Rescue Mission at the rate of $75 an hour. On July 15, 1988, he was included in Konnor's contingency agreement with the Rescue Mission, whereby the attorneys would receive a total of one-third of any amount by which the verdict exceeded the jurisdictional offer of $1,091,000. The Rescue Mission moved for approval of litigation expenses based upon the excess of $1,009,000. The circuit court gave the Redevelopment Authority an opportunity to request an evidentiary hearing on the reasonableness of the attorney fees, pursuant to *Narloch v. Department of Transp.*, 115 Wis. 2d 419, 436–37, 340 N.W.2d 542 (1983). The Redevelopment Authority did not request a *Narloch* hearing.

In support of its motion for litigation expenses, the Rescue Mission submitted affidavits of the two attorneys that they had invested a total of approximately 700 hours in the case. These affidavits also indicated that Southwick had extensive experience and qualifications in the area of eminent domain proceedings, and had written several professional articles and a book on the subject. The Rescue Mission also submitted an affidavit from Alan Marcuvitz, an attorney experienced in eminent domain proceedings. Marcuvitz alleged that he customarily charged clients a contingency fee equaling one-

ney, appraisal and engineering fees necessary to prepare for or participate in actual or anticipated proceedings before the condemnation commissioners, board of assessment or any court under this chapter.

third of the increase in the award amount, plus interest. Marcuvitz also stated that he believed such an arrangement was a general and customary practice of attorneys in the area, and that alternatively, customary hourly charges for such services ranged from $125 to $250 an hour.

Despite this evidence, the Redevelopment Authority argues that the awarded attorney fees are neither reasonable nor necessary. The Redevelopment Authority contends that examining the contingent attorney fee award in light of the number of hours the Rescue Mission attorneys invested in the case, yields an average hourly amount far in excess of what is reasonable. Rather, argues the Redevelopment Authority, the Rescue Mission attorneys should be compensated approximately $41,000, which represents the documented hours multiplied by an hourly rate of $75 (the Redevelopment Authority argued that the Rescue Mission attorneys should only be compensated for 548 hours). We disagree with this contention, and conclude that the circuit court did not abuse its discretion by granting an attorney fee award based on a contingency contract in this case.

This court addressed contingency fees in eminent domain cases in *Hutterli v. State Conservation Comm'n,* 34 Wis. 2d 252, 148 N.W.2d 849 (1967). This court stated, "[w]hile there is nothing *per se* improper in a contingency fee contract, it does not automatically follow that the circuit judge must honor it in applying his equitable discretion under sec. 32.06(9)(a), Stats. If it represents a reasonable charge, it should be granted; if it is excessive, it should not be granted. Thus, a contingency fee agreement is only a guide, but not a control on the question of a reasonable fee." *Hutterli,* 34 Wis. 2d at 258. The fact that a contingency fee agreement exists is

only a guide, and the court should consider all the circumstances of the case in determining whether the fee is reasonable. *Id.* at 259. *See also Standard Theatres,* 118 Wis. 2d at 742 n.7.

According the circuit court proper deference in reviewing this discretionary action, it is clear that the circuit court judge used a rational process in reaching his decision, a decision that a reasonable judge could reach. *See Loy,* 107 Wis. 2d at 414–15. First, the circuit court judge recognized that contingency fee agreements are often necessary in order for a party to secure adequate representation. He stated:

> Contingency fees work both ways, if the fee award is very small, then the fee is going to be small. If the award is high, then, of course, the fee is high.

> But, that's the nature of the contingency fee and if that is the way a litigant can obtain skilled and experienced legal services, not only in these kinds of cases, but in any kind of case, that that's [sic] a mechanism, I think, that the bar and the legal profession provide in order to allow legal representation to cases that otherwise might be chancy.

Additionally, the circuit court judge addressed other circumstances in the case which led to his conclusion.[14]

---

[14]SCR 20:1.5 FEES describes factors which determine the reasonableness of attorney fees:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

497

The circuit court judge acknowledged that the attorneys were highly skilled when he stated:

This was a well-tried case from both sides, there's no question about it, and I said it before that from my perspective it was a pleasure professionally to watch the attorneys for both sides operating in the courtroom arena.

A judge always likes to have a case where there are knowledgeable experienced attorneys who are highly skilled trying a case than less-experienced or less-skilled attorneys, so this case from both sides, I thought and still think, was extremely well-tried and it was professionally joyful for me to watch you gentlemen in operation.

He also discussed the length and nature of the trial itself:

One-third, as a contingency fee, in my experience, I believe historically and traditionally, is not excessive in a case which goes to a jury and which involves specialization and a great deal of skill and ethicacy [sic]. This was a case which lasted for several days, I forgot the exact length of time, to a jury and was preceded by hard-fought motions, which included briefs and legal argument, and a great deal of advocacy.

---

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

We cited the use of such factors approvingly in *Standard Theatres,* 118 Wis. 2d at 749–50 n.9.

Finally, he recognized the fact that the attorneys' efforts resulted in a very successful outcome for the Rescue Mission:

> [C]onsidering that that [sic] the circumstances involving the taking of the property, the pretrial motions and legal work that had to be done and the fact that this was a trial to a jury, has to take into account experience of the attorneys involved, the level of skill—skill employed, and the success of the litigation or the outcome of the litigation, I think is an appropriate consideration for the Court to look at to determine whether the fee is reasonable under the facts of this case.

As we stated in *Standard Theatres:* "the trial court is in an advantageous position to make a determination as to the reasonableness of a firm's rate. This is because the trial court may be aware of the costs incurred by a firm in managing its legal practice, or is capable of asking to be made aware of them." *Standard Theatres,* 118 Wis. 2d at 747.

We recognize that the Redevelopment Authority did not have any direct input into the amount of attorney fees the Rescue Mission agreed to pay, although the Redevelopment Authority is responsible for payment. Since the amount of a contingency award in a case like this is directly tied to the difference between the amount of the original offer and the final award, a more accurate original offer will reduce the condemnor's liability for attorney fees, if the case actually ends up in court. If the final award does not exceed the original offer by $700 and 15 percent the condemnor pays no attorney fees to the condemnee under sec. 32.28(3)(e), Stats.[15] Hence, it

---

[15]We note that only in the event that the jury award exceeded the original award by $163,650 (15 percent of

is in the condemnor's best interest to make its initial offer as accurate as possible, and in this sense it has an indirect effect on the amount of attorney fees awarded. *See Standard Theatres,* 118 Wis. 2d at 744–45; *Green Bay Redevelopment Auth. v. Bee Frank,* 120 Wis. 2d 402, 412–13, 355 N.W.2d 240 (1984) (where we discussed the legislative intent to make the condemnee whole and discourage low jurisdictional offers through the enactment of sec. 32.28).

We reiterate that a contingency fee agreement is only a guide, and not a control on the question of a reasonable fee. *See Hutterli,* 34 Wis. 2d at 258. The fact that the Rescue Mission agreed to pay its counsel a one-third contingency fee for services provided through trial,[16] rather than one-half or two-thirds, is significant in that regard. Based on all the circumstances of this case, we conclude that the circuit court properly exercised its discretion in approving the one-third contingency fee agreement between the Rescue Mission and its attorneys.

$1,091,000) would the Redevelopment Authority have had to pay any attorney fees under sec. 32.28(3)(e), Stats. Representing the Rescue Mission under this contingency arrangement was a significant gamble for the Rescue Mission attorneys because, under the terms of the agreement, their fee would only be paid if the Redevelopment Authority paid it under sec. 32.28(3)(e).

[16]The contingency fee amount of one-third of the excess recovered applies only to attorney services provided up to and including the jury trial. According to Konnor's affidavit in support of the Rescue Mission's motion for litigation expenses, the attorney fee was to increase to 40 percent in the event of an appeal to the court of appeals, and 50 percent in the event of an appeal to the supreme court. The circuit court will need to determine the reasonableness of the appellate contingency fee based on the facts of this case.

*By the Court.*—The decision of the court of appeals is reversed, and the cause is remanded for further proceedings consistent with this opinion.