IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 5, 2025 Session

## PIEDMONT NATURAL GAS COMPANY, INC. v. BLUEROAD FONTANEL, LLC

**Appeal from the Circuit Court for Davidson County**
**No. 19C1900      Thomas W. Brothers, Judge**

_____

### No. M2024-01860-COA-R3-CV

_____

A gas company obtained an easement by eminent domain across a property owner's land. A jury determined the amount of just compensation payable to the landowner. On appeal, the gas company argues that the trial court erred in allowing the jury to hear expert testimony from the landowner's expert regarding the value of the property and that the jury verdict is not supported by material evidence. Finding no abuse of discretion, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which JEFFREY USMAN and, VALERIE L. SMITH, JJ., joined.

Donald N. Capparella and Jacob Andrew Vanzin, Nashville, Tennessee, for the appellant, Piedmont Natural Gas Company, Inc.

Thomas V. White, Emily A. Guthrie, Andrée Blumstein, C. Dewey Branstetter, Jr., and William L. Harbison, Nashville, Tennessee, for the appellee, BlueRoad Fontanel, LLC.

### OPINION

#### FACTUAL AND PROCEDURAL BACKGROUND

This is a condemnation case concerning a large piece of property consisting of six parcels along Whites Creek in Nashville. A total of eleven structures were located on the property, including a 27,000-square-foot mansion formerly owned by country music star Barbara Mandrell, an inn, an event hall, a restaurant, a retail building, and a distillery. The property had most recently been used as a hospitality and event venue. BlueRoad Fontanel, LLC ("BlueRoad") purchased the property in February 2019 for $14,500,000, with the

intention of continuing and expanding the hospitality and event uses of the property. In August 2019, Piedmont Natural Gas Company ("Piedmont") filed a petition for condemnation seeking an easement to install a subsurface natural gas pipeline on the property. BlueRoad did not contest Piedmont's authority to take the easement but did contest the amount of just compensation proposed by Piedmont, $48,700, which was deposited with the circuit court clerk. The trial court entered an order confirming the taking in October 2019.

*The property and the easement*

The following parcel map shows the layout of the six parcels making up the property at issue.



Parcels 1, 2, 5, and 6 are bounded to the east by Whites Creek Pike. Whites Creek, the creek itself, runs along the western border of parcels 1, 2, and a small part of 5, and along the eastern border of parcels 3 and 4. The mansion is located on parcel 3.

The following acquisition map shows the location of the Piedmont easement:



The easement generally cuts across the tip of parcel 1, runs along the creek, and then cuts across portions of parcels 3 and 4.

*Motion in limine*

In June 2024, Piedmont filed a motion to exclude the expert testimony of Patrick Gibson, BlueRoad's expert, pursuant Tenn. R. Evid. 104(a), 702, 703, and 403, arguing that the testimony was "irrelevant, unreliable, and . . . unfairly prejudicial" because his

appraisal of the property concerned only the value of the property before the taking. After a hearing, the trial court entered an order on August 23, 2024, denying Piedmont's motion to exclude Mr. Gibson's testimony. The court concluded that Piedmont's objections went to the weight, not the admissibility, of Mr. Gibson's testimony and found no authority requiring an expert witness to provide both before and after values.

*Jury trial*

The issue of just compensation was tried before a jury over four days in August 2024. We will summarize the evidence presented at trial as relevant to the issues on appeal.[1]

Tim Farrell, owner of BlueRoad, testified that he had over 25 years of experience in real estate investment and development. He explained his interest in the Fontanel property and the research he conducted in the years prior to deciding to purchase the property. Mr. Farrell met with John Haas, the landscape architect and land planner who had worked with the prior owners, and "studied the entitlements[2] from the zoning ordinance to understand how we could use the property." Mr. Farrell testified about the preliminary specific plan ("SP")[3] in effect at the time he was considering purchasing the property. He stated that, "In the entitlement document, the specific plan, [the property] was called a rural resort," which would allow it to have lodging, restaurants, bars, gardens, recreation areas, and events. In Mr. Farrell's opinion, the events "were the primary driver of the business model" because "that's where the property could make its money."

Mr. Farrell pointed out a road or long driveway that came off of Whites Creek Pike and cut through the middle of the property. He stated that this road, which crossed over the gas pipeline, provided "the access point for the bulk of the property." On the other side of the pipeline were the amphitheater/stage, event fields, hiking trails, zip lines, and the

---

[1] Several witnesses testified about the zoning process. While this testimony was important for the jury to fully understand the events in this case, we will not address it here. In addition, we will not address the testimony of all the various Piedmont representatives unless it is relevant.

[2] The "entitlements" are the permissible uses for the property under the SP zoning classification. *See entitlement*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("A right to do, receive, or possess something either by law or by contractual arrangement.").

[3] The Metro Nashville zoning ordinance allows for specific plan districts (SPs) "to promote site specific development in the location, integration, and arrangement of land uses, buildings, structures, utilities, access, transit, parking, and streets." Metro Code § 17.08.020(C). Such a plan "establish[es] specific limitations and requirements . . . so as to respect the unique character and/or charm of abutting neighborhoods and larger community." *Id.* The property at issue was established as the Mansion at Fontanel Specific Plan District with zoning ordinances beginning in 2009 and further entitlements added in 2014 and 2016.

mansion. According to Mr. Farrell, 100 to 150 people might drive over the pipeline in a day; during a large event, this number would be significantly higher.

Mr. Farrell entered into a contract to buy the property in April 2018 and closed on the property in February 2019. He considered the purchase price of $14,500,000 to be "a great price," partly because it was an "off-market opportunity," so he was not competing against a number of other buyers. In Mr. Farrell's opinion, BlueRoad had the expertise and the money to "bring this property to the next level, to actually bring all the entitlements to fruition that had not yet been done." Further, Mr. Farrell testified, BlueRoad gave the seller "the opportunity to invest in our projects going forward as part of the negotiation of the purchase price so they could make more money on the back end, if we agreed to a lower price upfront." Mr. Farrell testified that, after contracting to buy the property and before Piedmont condemned the property in October 2019, BlueRoad spent an additional $8 million (above the purchase price) on the property. This amount included taxes, insurance, interest, consultants, technology, architects, and engineers.

Mr. Farrell then gave his opinion concerning the value of the property before the taking by Piedmont in October 2019:

> I believed at the time of the take, it was worth approximately $26 million dollars. And for a number of reasons. One, I think I explained that when we went under contract, we priced it in the middle, in early 2018, April of 2018, at $14.5 million dollars, which we believe was a very, very good buy; significantly below market for the reasons that I think I outlined. . . . We have a year-and-a-half go by, and everyone knows how Nashville – the real estate in Nashville, the tourism market, the residential market, everything in Nashville just went like this in that period. . . . We also believe that a lot of the money we spent brought it closer to being shovel ready, so to speak, or being closer to the point where you could actually build the development. So, we were closer [to] actually building the development, bringing it to fruition. So, the money we spent was essentially value added on top of the fact that it was already a very good buy, plus the fact that the Nashville real estate market continued to increase significantly over that time period.

Asked about the effect of Piedmont's easement for its pipeline, Mr. Farrell stated that the easement crossed the "heart of the property," as people had to cross over the easement to access most of the property, including the field where the big events took place. He explained that, "Part of the value of this – the entitlements on this property was that you could hold temporary events in the floodplain." The SP zoning allowed the owner to place tents and food trucks on the floodplain for concerts and other events; the owner could also use part of that space for temporary parking. He testified that, "we couldn't without [Piedmont's] permission, each time we wanted to cross it [the easement] get back to all of this land." In his opinion, the easement "took a large chunk of this property" by cutting off

- 5 -

access. Mr. Farrell also explained that the stage needed to face a certain direction to avoid sending the sound toward nearby neighborhoods. With the placement of the easement, he stated, "we had little room left for people to congregate; we had no room left for food trucks or, you know, all types of things; so, logistically that also made events very, very difficult."

Mr. Farrell was then asked about two meetings, in October and December 2019, that took place at the property with representatives of BlueRoad, Piedmont, and various consultants, including architects, engineers, and land planners involved in the project. Steven Fox, the project engineer for Piedmont, kept minutes of the meetings, and Mr. Farrell confirmed their accuracy. Mr. Farrell testified that he informed Piedmont and its representatives, both before and at the October 2019 meeting, that he wanted "to be able to operate my business" and explained the entitlements that went with the property. He requested a permanent encroachment allowing his company to cross over the easement:

> [P]ermanent encroachment, in other words, ongoing permission to use the property as it was entitled, for example, to cross over the property, you know, there was some talk of individual encroachment approvals, but the fact is you can't – I couldn't operate a business if I had to go to Piedmont every time I needed something. Imagine. I just said, you know, we cross over this pipeline a hundred times a day. I can't pick up the phone and call Piedmont every time I need to cross over this gas line. I also can't – Piedmont – it was either in October or December, one of those meetings, they told us their typical response time was thirty to sixty days. I can't wait that long to book events. If somebody comes to me and says, hey, I want to have a festival out here in six months, I can't say, well, hold on; I have to go ask the gas company if that's okay, 'cause then they just [go] to the next group. And the other – so, we couldn't a – we couldn't operate a business beholden to a gas company that we needed to ask 'mother, may I' every time we needed to use the property. So, that was the big challenge that was explained to Piedmont very early on, so when we said you needed permanent encroachments, we needed from Piedmont in writing, Hey, yes, you can actually . . . use the driveway that was in existence; you can drive over it with everything up to a box truck. . . . But for day-to-day operations, we needed the permanent ability to operate the property as entitled.

Based upon the October meeting, Mr. Farrell agreed to provide Piedmont with a list of what he called tier 1 and tier 2 encroachment requests. Tier 1 uses were those for which BlueRoad required permanent encroachments over the easement—for example, setting up temporary tents, parking cars. Tier 2 uses were for "anything that was more substantive and invasive [such as digging over the pipeline] that we would have asked for individual

permission on."[4] Mr. Farrell's representatives sent this list to Piedmont in mid-November 2019. The minutes from the December 2019 meeting at the property state, in part:

> Placement of the planned gas easement across the property with the easement restrictions provide[d] could significantly impact the event operations and future development plans. The purpose of this meeting is to discuss the potential impacts of a gas line on the normal operation of facilities and to try and mitigate some of the potential damages on the daily operation.

The minutes also reflect that Piedmont had been provided with a "tentative list of potential activities that may encroach on the planned easement." At the December 2019 meeting, according to Mr. Farrell, Piedmont representatives did not seem to have reviewed the encroachment requests.

The items for which BlueRoad sought permanent encroachments included the following: temporary canopies, use of the existing driveway, landscaping, parking, and use as a park or recreation area. Mr. Farrell testified that Tammy Sturgis, a Piedmont employee, was the main point of contact for BlueRoad regarding its encroachment requests.[5] Ms. Sturgis was at the October and December 2019 meetings. She informed Mr. Farrell that what BlueRoad was requesting "should not be a problem."

Mr. Farrell testified that, from the beginning of his negotiations concerning the easement, he worked with local Piedmont representatives, chiefly Ms. Sturgis. He testified that, "over time it seemed to be more non-local Duke Energy[6] people that, in my estimation and from their emails and conversations, weren't familiar with the property that became involved." On October 26, 2021, Mr. Farrell received an email from Elia Martin, a Duke Energy employee who lived in Florida, in response to the encroachment requests. In her email, Ms. Martin stated that, "The natural gas business unit of Duke Energy does not issue blanket encroachment agreements." She explained that construction plans and drawings would need to be submitted for review and that Duke Energy would need to be informed of the "pipeline depth at each crossing location area." Ms. Martin further stated that "festival canopies will not be approved within the PNG easement." Mr. Farrell stated that he was shocked to receive this email. Ms. Martin had not been involved in the prior two years of discussions about encroachments. Without blanket encroachments, he did not believe BlueRoad could operate its business.

---

[4] At Piedmont's request, BlueRoad later began referring to these requests as being for blanket and individual encroachments, rather than tier 1 and tier 2. BlueRoad provided Piedmont with a second submittal using the new terminology.

[5] Piedmont did not call Ms. Sturgis, who was no longer a Piedmont employee, to testify at the trial.

[6] Duke Energy purchased Piedmont in 2016.

- 7 -

Mr. Farrell was asked his opinion on the value of the property after the Piedmont gas line was installed. His response: "[T]he market told us it was $11.5 million dollars." BlueRoad sold the property at auction in 2022 in six separate parcels for a total of $11,500,000. Mr. Farrell explained that, after receiving the information that Piedmont would not grant a permanent encroachment for use of the road, "we, unfortunately, were forced by our lender to sell the property, because we couldn't use it as – as it was entitled and for the reasons we bought it for." Mr. Farrell opined that "it was a very difficult sale prospect to sell a property that the – the use was unknown." The property was for sale with a commercial broker for six months, and Mr. Farrell continued to attempt to work out an agreement with Piedmont. When the property did not sell, BlueRoad's lender decided to sell the property at auction, which occurred in October of 2022. Five different buyers bought the six parcels.

During the trial, Piedmont took the position that BlueRoad always had the right to use the existing road/driveway without permission from Piedmont. When asked about this idea at trial, Mr. Farrell responded:

> We – we certainly wouldn't have spent two-and-a-half years chasing permission if – if we had permission. Nobody ever said to us, Hey, you already have permission. No need to have these multiple meetings and all of these – these conference calls, etcetera, etcetera. . . . And, you know, it also says down here [in Piedmont's general guidelines regarding easements], "Stakeholders should consult with Piedmont for a final determination" . . . So, all of this stuff said we couldn't use it as it was entitled. And those were – that was the intent of the meeting. We expressed what we needed – or of all the meetings. We expressed what we needed to use it for early on, at least, there – there seemed to be, Okay, let's work this out. But then that drug on for months and months and months, and, ultimately, somebody we had never worked with said, you can't have blanket encroachments.

John Haas, a land use planner and landscape architect with The EDGE Group, Inc., testified that he had been involved with the property since 2007, working with the previous owners. He explained that he had contracted with the previous owners to help them realize their plan of "making the existing Barbara Mandrell mansion into a special events facility, as well as creating a stage for outdoor music concerts," a restaurant, a zipline location, and other uses. Beginning in 2009, an SP governed the uses permitted on the property, and this document was amended several times. Pursuant to these entitlements, 75 percent of the approximately 135 acres was required to be open space and could not be built on. The SP permitted 150 hotel rooms, approximately 1,000 temporary parking spaces, daily tours of the Fontanel mansion, special events at the mansion, and concerts and other performances at the amphitheater eight months of the year, with up to 4,500 people. Mr. Haas's group was the lead consultant on the project and represented the property owners at zoning hearings and community meetings that led to the adoption of a preliminary SP in 2016,

which was the SP in effect at the time when BlueRoad purchased the property.[7] The 2016 preliminary SP added approximately 31 acres to the property and permitted hotel rooms at a location on Whites Creek Pike. Mr. Farrell contacted Mr. Haas when he was considering purchasing the property to discuss what types of entitlements existed on the property.

Once the easement was taken, Mr. Haas explained, "it was imperative that those permanent encroachments could be granted so that [Mr. Farrell] could continue to operate the property as it was intended and entitled." Mr. Haas testified that he reviewed the entitlements on the property with Piedmont representatives, including Mr. Fox and Ms. Sturgis. He also explained the entitlements at the October and December 2019 meetings at the property. Mr. Haas echoed Mr. Farrell's testimony about these meetings and BlueRoad's submittal of written encroachment documents to Piedmont beginning in November 2019. Mr. Haas also gave similar testimony to Mr. Farrell regarding the process of requesting permanent encroachments and the significance of Ms. Martin's email. He denied that anyone from Piedmont had ever stated or suggested that BlueRoad did not need any encroachments to cross the property. He testified that Ms. Sturgis specifically told him that BlueRoad could not use the existing driveway/road over the easement without Piedmont's permission. Mr. Haas gave detailed testimony concerning how the lack of essential permanent encroachments meant that "we lost the ability to use that easement area completely."

Steven Fox, a senior project manager at AECOM Technical Services, was the project manager for Energy, Land & Infrastructure, LLC ("ELI"), the engineering firm hired by Piedmont to build the pipeline at issue. Mr. Fox was involved with all of the parcels of land (over 65) affected by the pipeline. He testified that the Fontanel property "was identified very early as a project risk because of the – the scheduling they had at that facility." According to Mr. Fox, ELI "was told to accommodate a design that could make both operations at Fontanel work and the gas line work." Mr. Fox was aware of the types of events that took place at the property and had attended an event there himself.

Mr. Fox understood that BlueRoad, through EDGE, had "a plan for resort expansion that took multiple years for approval." He stated that, "Fontanel is one of two properties in Nashville that has approval for field parking, dining events, within the floodway buffer." Mr. Fox testified that, at the meetings in October and December 2019, the stakeholders thoroughly discussed the property's special uses, BlueRoad's need for access to the property over the easement, and the encroachment request process. He did not hear any pushback from Piedmont at these meetings about granting an encroachment over the pipeline. To Mr. Fox's knowledge, no one from Piedmont ever told BlueRoad that it was

---

[7] Mr. Haas and a witness from the Metro Nashville Planning Department testified that a preliminary SP, once passed by the Metro Council, establishes the entitlements or uses permitted within the property subject to this type of special zoning. These entitlements run with the property and, therefore, remain on the property if it is sold. A final SP cannot be requested until the project is under construction, and Mr. Haas described it as "more like a site construction document" that includes site grading and utility design.

not necessary to obtain an encroachment to cross the pipeline easement. After the meetings at the property, Mr. Fox had biweekly meetings with Ms. Sturgis and other Piedmont employees concerning the project. He testified that the Piedmont representatives agreed on the need for a permanent encroachment and stated that it was up to Ms. Sturgis "to accommodate the encroachment" and "[g]et it done."

Bobby Garner, a retired Piedmont employee, testified that he was a senior project manager at the time of the construction of the pipeline over the property. Mr. Garner attended the October and December 2019 meetings at the property and agreed that BlueRoad's tier 1 and tier 2 encroachment requests were a subject of discussion at the meetings. Mr. Garner stated:

> Crossing the easement or crossing the pipeline on a routine basis, goes without saying, we could prohibit that kind of activity. Going up and down a driveway crossing the pipeline would not be a prohibited activity.

Mr. Garner did not recall the matter of BlueRoad crossing the pipeline being an issue but acknowledged that it was not his area of responsibility. He identified Ms. Sturgis and the asset protection team as being the Piedmont people involved in discussing the easement encroachments.

John Foster was a senior asset protection program manager with Duke Energy/ Piedmont Natural Gas; he lived in North Carolina. He testified that, under Piedmont's land use guidelines, a landowner could still use an existing driveway to cross over an easement without seeking permission from Piedmont.[8] When presented with the encroachment worksheet submitted by BlueRoad to Piedmont, Mr. Foster opined that BlueRoad made a "blanket" request for multiple encroachments and that Piedmont would not review such a request. He stated that Piedmont/Duke needed "to know information about each crossing: where it's going to take place, what it's going to be, and, you know, what the nature is it going to be constructed with [sic]." Presented with Ms. Martin's email, Mr. Foster explained that Piedmont/Duke would not, as the email stated, approve festival canopies.

On cross-examination, Mr. Foster testified that Ms. Sturgis, whom he had never met, had no authority to discuss encroachments with a landowner. He stated that the application submitted by Mr. Haas with tier 1 and tier 2 uses did not "meet our submittal criteria." Mr. Foster did not know why Ms. Sturgis would have requested such an application. Mr. Foster took the position that Piedmont/Duke's land use guidelines did not govern existing uses (those in existence prior to the construction of the pipeline). On further questioning, he acknowledged that the specific guidelines at issue did not make a distinction between new and existing uses. When asked about the special uses applicable

---

[8] Mr. Foster later testified that Piedmont/Duke would be concerned about any heavy equipment crossing the easement and would need to make a determination about specific crossings of heavy equipment.

to the property at issue, Mr. Foster stated that he was not aware of the type of activities for which the property was used because he "was not involved in anything at this location until the encroachment request was submitted."

Mr. Foster testified that neither Ms. Sturgis nor Mr. Garner was authorized to be involved in the encroachment process. He stated that Tim Bess was the contact person for encroachments in the Nashville area. (Mr. Bess had been called as a rebuttal witness earlier that day and had been withdrawn by Piedmont because he could not remember whom he had met with regarding the property at issue.)

Ebony Wiggins testified on behalf of Piedmont. Ms. Wiggins was the manager of Land Services Midwest for Duke/Piedmont. Her duties included managing the land services team as well as the asset protection team for a five-state territory, including Nashville. Ms. Wiggins testified that Ms. Sturgis was a real estate representative for Piedmont in Nashville and was not responsible for approving encroachments; Ms. Sturgis no longer worked for the company. Ms. Wiggins stated that Mr. Bess was the field representative in the Nashville area for encroachments. She testified that there were no restrictions on existing uses, but also stated that the land use guidelines were not hard and fast rules and that the company recommended early communication if there was any uncertainty regarding appropriate uses of the property over the easement.

On cross-examination, Ms. Wiggins stated that Ms. Sturgis and Mr. Garner were the two main local people on the Fontanel project and that it was logical for BlueRoad to reach out to them with questions. She further acknowledged that it was reasonable for a landowner investing money in a development to seek confirmation that he could cross the easement and pursue other uses. Ms. Wiggins maintained that no encroachment would be needed for existing uses but also agreed that canopies (which had been used previously) would not be permitted. She could not speak to whether or not the Duke/Piedmont's position that no encroachment was needed had been communicated to BlueRoad.

BlueRoad and Piedmont both presented expert testimony regarding the value of the property. Patrick Gibson testified for BlueRoad. Mr. Gibson, an executive director for Colliers International Valuation & Advisory Services, LLC, specialized in commercial real estate appraisal. Mr. Gibson prepared an appraisal in which he reached the conclusion that the property's value before the taking was $25,500,000.[9] BlueRoad did not request an after-taking appraisal from Mr. Gibson. Mr. Gibson explained how he had conducted his appraisal, including his conclusion that the highest and best use of the property was for hospitality and entertainment venues.

---

[9] Mr. Gibson had previously prepared an appraisal of the property for a third party in 2022, when he valued the property at $29,000,000. He was subsequently asked by BlueRoad to perform an appraisal of the property as of the date of the taking, October 4, 2019.

Mr. Gibson was questioned about the appraisal of Jim Turner, Piedmont's expert (discussed more fully below), who gave a before-taking valuation of $11,700,000. In Mr. Gibson's view, the most fundamental difference between the two appraisals was the selection of comparable properties. Both appraisers agreed that the highest and best use of the property was for hospitality and entertainment. Mr. Gibson explained that his appraisal included "comparable sales that we felt better fit the highest and best use profile, given the SP in place on the subject property," whereas Mr. Turner's appraisal included "residential and agricultural sales in the immediate area." Unlike Mr. Gibson's appraisal, Mr. Turner's report did not focus on properties with hospitality and performance-related uses, and Mr. Gibson opined that this was the biggest factor contributing to the difference in value reached by the two experts.

On cross-examination, Mr. Gibson testified that he had completed other appraisals for which he had been asked to give a before or after value only. Mr. Gibson agreed that the SP classification made the property unique and that there were no other lodging or entertainment SPs in the immediate area. He reviewed the comparable properties ("comps") he used in his report, which included properties in North Carolina and Georgia, and the adjustments he made in order to compare the comparables to the property at issue. Mr. Gibson also explained his reasoning for splitting the Fontanel property into entitled properties and excess land, which he defined as land "not needed to service or support an existing use." Mr. Gibson agreed that he and Mr. Turner followed the same process in completing their appraisals, but that their assumptions had differed. He provided some criticism of the methods used by Mr. Turner in his appraisal and reiterated that his biggest criticism was Mr. Turner's comp selection.

Mr. Turner, a real estate appraiser at BBG, testified for Piedmont. He opined that the property's highest and best use was for an event venue, lodging, and hospitality, which he described as consistent with Mr. Gibson's determination. BlueRoad questioned Mr. Turner regarding his before-taking valuation of $11,792,800 (as of October 2019) in light of the fact that BlueRoad had entered into a contract to purchase the property in April 2018 for $14,500,000. Mr. Turner opined that BlueRoad had a motivation to develop the six parcels for a specific planned use, which he considered "a motivation that the wider market may not have." He thought this "could have been one of the reasons why the purchase price was higher than my indication of the market value."

As to the land used for the easement itself, the right-of-way, Mr. Turner opined that the direct damages were $98,700. As to the impact of the easement on surrounding property, Mr. Turner testified that he found incidental damages to a small half-acre portion of the property north of the easement line (on Knight Road). Otherwise, he found no incidental damages. When asked about BlueRoad's loss of access to much of the property because of Piedmont's failure to grant a permanent encroachment, Mr. Turner stated that he believed BlueRoad maintained access after the pipeline was built and, therefore, did not

sustain any damages for loss of access. Mr. Turner gave the following testimony in response to questioning from BlueRoad's counsel:

> Q. You've heard the testimony in the courtroom from Steven Fox, the project engineer, that representatives of Piedmont, and he named them by name, Tammy Sturgis, Mr. Garner and another gentleman, Ingham, that they repeatedly had meetings that said, they need to discuss and give a permanent encroachment. Why would they have those conversations if it was just carte blanche and the client could have gone and used it?
>
> A. I believe there were specific requests that the client had for use of directly affected property over the easement and they – the client was looking, your client, the developer, was looking for a blanket encroachment agreement to allow for tents and different activities on the – within the area where the easement was; but it wasn't narrowed down – the request wasn't narrowed down to only access. I believe access is the main – the main component, the main issue at stake here. I believe the issue of access is – is the primary concern. And I don't believe that access would have been ultimately denied by Piedmont.
>
> . . .
>
> Q. Let me ask this, please, sir. You're certainly aware that for a period of about two years, that my client and his engineer requested that permanent encroachment. You're aware of that, aren't you?
>
> A. I'm not aware of all – other than the conversations that occurred in the courtroom, I do believe there were attempts to, based on my understanding of the testimony, there were attempts to gain specific encroachment agreements with the pipeline company, and one of those included access. That was one of the line items in the litany of requests that were made.
>
> Q. And it was never granted, was it?
>
> A. There was never a request for only access.

BlueRoad's attorney questioned Mr. Turner about his appraisal methodology and comparable sales properties. Mr. Turner disagreed with the idea of comparing his valuation opinions with those of Mr. Gibson or the owner. BlueRoad asked Mr. Turner whether, if BlueRoad "was not able to get the authority to go over the right of way to get to the east side of the property, if they couldn't get that authority, that would be a very significant impact for incidental damages, wouldn't it?" Mr. Turner responded: "If they lost access to the east side of the property permanently, it would be a major impact to the property."

When questioned by Piedmont, Mr. Turner explained his method of conducting the appraisal and his criticisms of Mr. Gibson's appraisal. He disagreed with the development potential Mr. Gibson assigned to the excess land and with the comparable sales used by Mr. Gibson. He also disagreed with Mr. Gibson's division of the property into the primary site and excess land. Mr. Turner stated that he considered the entire property as a whole

and calculated the value of the underlying land and the improved sales value (for the buildings).

The jury determined that BlueRoad suffered incidental damages from the taking in the amount of $13,896,800. This amount was based upon the jury's findings regarding the fair market value of the property: $25,500,000 before the taking, and $11,603,200 after the taking. The court entered a final judgment in the amount of $13,798,100 (reflecting the subtraction of the $98,700 originally tendered by Piedmont with the court from the total incidental damages found by the jury). Piedmont filed a motion for a new trial, to alter or amend the verdict, or to grant a remittitur, which the trial court denied. The trial court awarded Fontanel $14,203 in discretionary costs.

*Issues on appeal*

On appeal, Piedmont raises the following issues: (1) whether the trial court abused its discretion in denying Piedmont's motion in limine to exclude the before-taking value testimony of BlueRoad's expert; (2) whether it was permissible for the jury to blend the before-taking value from one expert and the after-taking value from another expert to calculate the just compensation for a taking; (3) whether the jury verdict was not supported by material evidence and, therefore, the trial court abused its discretion in failing to grant a new trial; and (4) whether the trial court's award of discretionary costs should be reversed.

EMINENT DOMAIN

The Tennessee Constitution requires that "no man's particular services shall be demanded, or property taken, or applied to public use, without the consent of his representatives, or without just compensation being made therefor." TENN. CONST. art. 1, § 21. "Just compensation" has been defined as "an amount consisting of the value of the land or rights taken and any incidental damages less any benefits resulting from any improvement." *Water Auth. of Dickson Cnty. v. Hooper*, No. M2009-01548-COA-R3-CV, 2010 WL 1712968, at *4 (Tenn. Ct. App. Apr. 29, 2010). Our legislature has directed that "the jury shall give the value of the land or rights taken without deduction, but incidental benefits which may result to the owner by reason of the proposed improvement may be taken into consideration in estimating the incidental damages." Tenn. Code Ann. § 29-16-203(a)(1).

In an eminent domain proceeding, the burden of proof is on the landowner to produce evidence regarding just compensation. *Hooper*, 2010 WL 1712968, at *5. Just compensation generally equates to the fair market value on the date of the taking of the property. *Nashville Hous. Auth. v. Cohen*, 541 S.W.2d 947, 950 (Tenn. 1976) (citing *Alloway v. Nashville*, 13 S.W. 123 (Tenn. 1889)). In determining what constitutes fair market value, courts seek to identify "the price that a reasonable buyer would give if he were willing to, but did not have to, purchase and that a willing seller would take if he were

willing to, but did not have to, sell." *Id.* (citing *Davidson Cnty. Bd. of Educ. v. First. Am. Nat'l Bank*, 301 S.W.2d 905 (Tenn. 1957); *Woodfolk v. Nashville & Chattanooga R.R. Co.*, 32 Tenn. 422 (Tenn. 1852)). In addition, our Supreme Court has observed that "the rule in Tennessee has long been stated to be that the jury must consider all capabilities of the property and all the legitimate uses for which it is available and reasonably adapted." *Id.*

In this case, Piedmont did not take property in fee simple; rather, the taking was an easement to allow for a gas pipeline. Where less than a fee simple is taken, "the fair market value of the rights taken is generally found by determining the difference in the fair market value of the entire property prior to the taking and its value after the taking." *Hooper*, 2010 WL 1712968, at *4. Moreover, "if the taking has adversely impacted the remainder of the property, a court may also award incidental damages." *Id.* Here, the dispute is over the appropriate amount of incidental damages—damages to the landowner's remaining property, not the value of the property actually taken.

ANALYSIS

I.     Motion to exclude expert testimony

Piedmont argues that the trial court erred in denying its motion in limine to exclude the testimony of BlueRoad's expert, Patrick Gibson.

We review a trial court's ruling on the admissibility of evidence, including a decision on a motion in limine, under an abuse of discretion standard. *Singh v. Larry Fowler Trucking, Inc.*, 390 S.W.3d 280, 284 (Tenn. Ct. App. 2012). A trial court abuses its discretion when it "causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski v. Gonsewski,* 350 S.W.3d 99, 105 (Tenn. 2011).

In the order denying Piedmont's motion, the trial court made the following findings:

1. Mr. Gibson is a Certified General Appraiser and as such may testify as to his opinion of the value of the property before the taking, which is a purely evidentiary matter and admissible under Tenn. R. Evid. 702.
2. Any objection by [Piedmont] as to his testimony goes to the weight to be given by a jury, not admissibility of his testimony as an appraiser.
3. After review of case law, the Court finds no authority to support [Piedmont's] argument that an expert witness is required to offer both the before and after value of the property in order for his or her testimony to be admissible, and therefore failure to offer the after valuation does not in and of itself disqualify such expert's testimony under Rule 702 as to relevance.

4. Mr. Gibson will provide his opinion only as to the value of the property prior to the taking and no questions shall be asked to elicit testimony as to the value of the property after the taking. [BlueRoad] may offer proof through other witnesses or evidence as to the value of the property immediately after the taking.

On appeal, Piedmont argues that the trial court's evidentiary ruling was an abuse of discretion because (1) his opinion "suffered from an analytical gap making his opinion untrustworthy because he never provided an After-Taking Value, and (2) was unduly prejudicial by inviting the jury to speculate by blending values from different appraisals performed by different experts." Both arguments are based upon the theory that Mr. Gibson's before-taking valuation was unreliable and prejudicial in nature because of his failure to make an appraisal of the property after the taking. Based upon this alleged "analytical gap," Piedmont maintains, the trial court abused its discretion in allowing Mr. Gibson to testify.

As will be discussed below, we believe the jury could have reached its verdict without "blending" the supposedly inconsistent opinions of Mr. Gibson and Mr. Turner. Even if we accept the notion that the jury did blend values from the two experts, however, Piedmont must establish that the trial court abused its discretion in some way (by applying an incorrect legal standard, reaching an illogical result, or otherwise) in allowing the jury to hear Mr. Gibson's testimony.

Piedmont has offered no Tennessee caselaw to support its position on the inadmissibility of an expert's before-taking value in the absence of an after-taking appraisal by the same expert. Under Tennessee law, Tenn. R. Evid. 702 and 703 address the admissibility of expert testimony. Under Rule 702, a qualified expert may testify if his opinion "will substantially assist the trier of fact to understand the evidence or to determine a fact in issue." Rule 703 governs the appropriate bases underlying an expert's opinion and states that, "The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness." Pursuant to Tenn. R. Evid. 403, relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Piedmont generally asserts that, due to the asserted "analytical gap" inherent in the use of values from different experts, the admission of Mr. Gibson's opinion was "unduly prejudicial to Piedmont."

We are not inclined to accept the bright-line rule argued by Piedmont in the absence of Tennessee authority to support it. Piedmont cites a case from Alabama that is not on

point[10] and a federal court case applying Tennessee law. *United States v. An Easement & Right-of-Way Over 3.74 Acres of Land*, 415 F. Supp. 3d 812, 815 (M.D. Tenn. 2019), was an eminent domain action initiated by the Tennessee Valley Authority ("TVA") to take a permanent easement in order to erect and maintain electric power transmission structures. The landowner offered an appraisal from Russell Parrish, a licensed Tennessee appraiser, who opined that the highest and best use of the property was to be rezoned for single-family development. *Id.* at 816. At the time of the taking, the property was zoned for and used for agriculture. *Id.* Mr. Parrish also opined that there was a 50% diminution in the value of a 300-foot buffer area outside the right-of-way. *Id.* at 817. Based upon these determinations, Mr. Parrish concluded that the total just compensation due was $123,500, and he rendered no opinion based upon the property's agricultural use. *Id.* at 816-17.

The United States filed a motion to exclude Mr. Parrish's testimony under Rules 702 and 703 of the Federal Rules of Evidence on the ground that, "because the pre-take and after-take value opinions are premised upon the highest and best use and buffer zone opinions," his opinions as to the pre-take and after-take values were unreliable. *Id.* at 817. After examining Mr. Parrish's report in detail, the court found that, with respect to both his highest-and-best-use opinion and his buffer-zone opinion, Mr. Parrish failed to provide relevant facts and data and had not applied reliable methods and principles to support them. *Id.* at 824, 827. The court, therefore, excluded the resulting opinion testimony regarding the before and after values of the property and damages from the taking. In its brief mention of this case, Piedmont relies on the court's findings that there was "'simply too great an analytical gap between the data and the opinion proffered.'" *Id.* at 827. (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). The *United States v. Right of Way* decision does not provide support for the existence of the "analytical gap" asserted by Piedmont here. The case does not shed any light upon the inadmissibility of an expert's opinion on the before-taking value for the sole reason that the expert did not offer an after-taking value.

We find the case of *Water Authority of Dickson County v. Hooper* 2010 WL 1712968, at *1, more instructive. That case involved a county water authority's taking of an easement to install a water transmission line. *Id.* The water authority appealed the trial court's award of $12,526 for the taking of the easement and incidental damages. *Id.* The landowners testified regarding the value of their properties before the taking. *Id.* The landowners' expert gave his opinion on the value of the easements taken using two methods: comparing the prices of other recorded easements in the county over a certain period, and comparing the sales prices of tracts of land similar in size to the easements taken within a certain radius of the property. *Id.* at *2. The authority also presented expert testimony on the value of the property; he opined that the landowners were only entitled to

---

[10] The result reached by the Court in the Alabama case cited by Piedmont, *City of Cullman v. Moyer*, 594 So.2d 70, 72 (Ala. 1992), turned on the city appraiser's failure to follow the applicable statutory method for determining damages from a taking. Therefore, the court's determination that the testimony of the city appraiser was properly excluded is not instructive in the present case.

nominal damages because the easement did not cause any damage to the property. *Id.* The environmental engineer involved in the construction of the water line also testified on behalf of the authority and discussed the uses of the property on top of the pipeline. *Id.* at *2-3. She explained that no permanent structures should be constructed on top of the easement. *Id.* at *3.

On appeal, the water authority argued that the trial court erred in admitting the testimony of the landowner's expert on the ground that it was inadmissible and irrelevant. *Id.* at *5. The water authority asserted, in part, that the expert failed to offer an opinion on the value of the properties or the easement, explain how the comparison properties were comparable, or testify as to the impact of the easements. *Id.* at *7. This Court reasoned as follows:

> With respect to Mr. Gerdeman's lack of an opinion as to the value of the property rights taken or the impact of the taking on the remainder of the property, the Authority has cited no case law requiring the landowners to put forth expert opinion testimony of value and we have found none. Evidence of value may take many forms; the most common are comparable sales and opinion testimony as to value. In this case, the landowner put forth both forms choosing to present comparable sales evidence through their expert witness while testifying themselves as to their opinion of value. Tennessee has long "followed a policy of liberality in admitting opinion evidence respecting the fair cash market value of real estate" allowing both lay and expert witnesses to give his or her opinion of the fair market value of real estate so long as it is not founded on pure speculation. *State ex rel. Smith v. Livingston Limestone Co.*, 547 S.W.2d 942, 943 (Tenn. 1977); *see Wray v. Knoxville, L.F. & J.R. Co.,* 113 Tenn. 544, 82 S.W. 471 (1904); *Drainage Dist. No. 4*, *Madison County v. Askew,* 140 Tenn. 314, 204 S.W. 984 (1918); *Lebanon & Nashville Turnpike Co. v. Creveling*, 159 Tenn. 147, 17 S.W.2d 22, 65 A.L.R. 440 (1929); *Union Joint Stock Land Bank of Louisville v. Knox County,* 20 Tenn. App. 273, 97 S.W.2d 842 (1936); 27 *Am.Jur.2d Eminent Domain* § 581. Mr. Gerdeman's testimony about comparable sales was not made irrelevant merely because he did not also give his opinion of the value of the properties. The fact that Mr. Gerdeman did not inspect the property or give an opinion on the value of the property were issues of weight and credibility of his testimony subject to cross-examination and consideration by the fact finder. Accordingly, we do not find that the trial court abused its discretion in admitting his testimony on the grounds of relevance.

*Id.* at *8.

In another case, *City of Brentwood v. Cawthon*, No. M2009-02330-COA-R3-CV, 2010 WL 1931095, at *1 (Tenn. Ct. App. May 13, 2010), this Court again addressed the

admissibility of expert testimony in a condemnation case, this time involving the city's construction of a water tank. The city appealed the jury's award of incidental damages, arguing that the trial court erred in admitting the testimony of Mr. Parrish, the landowner's expert witness, who "opined that there was a 12.5 percent diminution in value to the western tract of Mr. Cawthon's property due to the loss of the property's hilltop view and the decline in aesthetics with the water tank on the highest hilltop on the property." *Id.* at *2. The city contended that Mr. Parrish "failed to calculate the fair cash market value of the remaining property immediately after the taking," *Id.* at *3, emphasizing that Mr. Parrish did not reference comparable sales or other data. *Id.* at *5. This Court concluded that the trial court had not "abdicated its role as gatekeeper or otherwise abused its discretion in admitting Mr. Parrish's testimony relating to incidental damages." *Id.* at *6. In reaching this conclusion, we stated:

> In addition to testifying about his experience as a real estate appraiser generally, Mr. Parrish testified about his personal experience and familiarity with other large public works projects that diminished the visual appeal of properties in their vicinity. This testimony served to establish a connection between Mr. Parrish's knowledge of and experience with large public projects that were not aesthetically pleasing and the basis for his opinion as to the impact of the large concrete structure affecting the property in this particular case. We note the trial court's statement while ruling on the City's motion for a directed verdict that "while still testifying within his field [of expertise], certainly [he] was reaching a bit" and understand the City's contention that Mr. Parrish did not fully explain how or why he concluded that the water tank resulted in 12.5 percent diminution in value. Nevertheless, there was sufficient connection between Mr. Parrish's knowledge and experience to give reliability to his opinion, such that we cannot conclude that the trial court abused its discretion in allowing the testimony, which could then be challenged on cross-examination and ultimately weighed by the jury.

*Id.* (citations omitted).

As this Court emphasized in *Hooper*, Tennessee follows "'a policy of liberality in admitting opinion evidence respecting the fair cash market value of real estate' allowing both lay and expert witnesses to give his or her opinion of the fair market value of real estate so long as it is not founded on pure speculation." 2010 WL 1712968, at *8 (quoting *State ex rel. Smith v. Livingston Limestone Co.*, 547 S.W.2d 942, 943 (Tenn. 1977)). In this case, BlueRoad did not contest the after-taking value stated by Mr. Turner. Mr. Gibson and Mr. Turner employed the same overall methodology (the sales comparison approach) in their appraisals but reached different results as to the before-taking value of the property.[11]

---

[11] Piedmont asserts that the two appraisals were not comparable because of other differences.

Mr. Gibson, like Mr. Turner, was subject to cross-examination, and the jury had the opportunity to assess his credibility and the basis for his opinion. We have concluded that Mr. Gibson's failure to testify on the after-taking value did not make his testimony on the before-taking value irrelevant or prejudicial. We agree with the trial court that Piedmont's objections regarding Mr. Gibson's testimony go "to the weight to be given by a jury, not [the] admissibility of his testimony as an appraiser."

II.     Jury verdict

Piedmont argues that the jury's verdict was not supported by material evidence and, therefore, the trial court erred in failing to grant a new trial. In response, BlueRoad asserts that Piedmont waived the issue of the sufficiency of the evidence by its failure to move for a directed verdict and, if the issue was not waived, that the verdict is supported by material evidence.

In an appeal from a civil jury trial, we review the findings of fact using the standard articulated in Tenn. R. App. P. 13(d). *Creech v. Addington*, 281 S.W.3d 363, 372 (Tenn. 2009). Under that standard, a jury's factual findings will be set aside only "if there is no material evidence to support the verdict." TENN. R. APP. P. 13(d). We review the trial court's determinations on questions of law de novo with no presumption of correctness. *Thurman v. Harkins*, No. W2004-01023-COA-R3-CV, 2005 WL 1215959, at *2 (Tenn. Ct. App. May 23, 2005).

We must first address BlueRoad's waiver argument. Under Tennessee law, for an appellate court to consider the sufficiency of the evidence to support a jury's verdict, "a motion for a directed verdict must have been made at the conclusion of all of the proof and renewed in a post judgment motion following the jury's verdict." *McLemore ex rel. McLemore v. Elizabethton Med. Invs., Ltd. P'ship*, 389 S.W.3d 764, 778 (Tenn. Ct. App. 2012) (citing *Steele v. Columbia/HCA Health Care Corp.*, No. W2001-01692-COA-R3-CV, 2002 WL 1000181, at *3 (Tenn. Ct. App. May 13, 2002)). As explained by this Court in *Steele*:

> The question of whether evidence is sufficient to support a jury verdict is tested by a motion for a directed verdict, and in order for the trial court to consider the sufficiency of the evidence in a post trial motion, the moving party must have made a motion for a directed verdict at the conclusion of all of the proof. TENN. R. CIV. P. 50.01 & 50.02; *Cortez v. Alutech, Inc.,* 941 S.W.2d 891, 894 (Tenn. Ct. App. 1996). Similarly, in order for this Court to review the sufficiency of the evidence on appeal, the motion for a directed verdict must have been made at the conclusion of all of the proof and renewed in a post judgment motion following the jury's verdict. *Cortez*, 941 S.W.2d at 894; *See also* Robert Banks, Jr. & June F. Entman, *Tennessee Civil*

2002 WL 1000181, at *3; *see also Korshoff v. Wesley Fin. Grp., LLC*, No. M2022-00630-COA-R3-CV, 2024 WL 445849, at *8 (Tenn. Ct. App. Feb. 6, 2024).

In the present case, Piedmont did not make a motion for a directed verdict at any point during the trial. Therefore, Piedmont waived its argument that there was not material evidence to support the verdict.

Even without the waiver, Piedmont's challenge to the sufficiency of the evidence would likely fail. Piedmont's position is that the jury blended the before-taking and after-taking values from different appraisers, Mr. Gibson and Mr. Turner, thereby resulting in a verdict not supported by material evidence. Piedmont asks this Court to follow decisions from four other states to adopt a rule prohibiting the blending of expert valuations. Cases from other jurisdictions may be persuasive but are not controlling authorities. *Clifton v. Tenn. Farmers Mut. Ins. Co.*, 638 S.W.3d 664, 677-78 (Tenn. Ct. App. 2021). Moreover, our review of the cases from four other states cited by Piedmont on appeal, which were not provided to the trial court, reveals that these decisions are very fact-specific and do not establish a bright-line rule prohibiting a jury from considering values from different appraisals in condemnation cases.[12] More importantly, the jury in this case had the opinion

---

[12] For example, Piedmont cites *Genge v. City of Baraboo*, 241 N.W.2d 183 (Wis. 1976), a case in which the city brought an action to condemn 11.73 acres of the landowners' property to provide a clear zone at the end of an airport runway. The trial court determined that the jury's verdict was excessive and granted the city a new trial. *Id.* at 184. The appellate court determined that the landowner's valuation was not credible evidence because it was not supported by any basis. *Id.* at 185. The court affirmed the result reached by the trial court based upon its conclusion that "[t]he answers of the jury to the two special verdict questions on before-and-after taking values resulted in an award higher than that established by the testimony of any expert witness." *Id.* at 184-85.

The Wisconsin Supreme Court later distinguished *Genge* in the case of *Milwaukee Rescue Mission, Inc. v. Redevelopment Authority of the City of Milwaukee*, 468 N.W.2d 663, 665 (Wis. 1991), a case involving the condemnation of a lot and a four-story concrete building used to provide services to homeless men. Both of the expert appraisers classified the building as a "special use property" and used the cost approach for their appraisals. *Id.* at 666. The rescue mission's expert testified that the fair market value of the property was between $1,356,100 and $1,536,000; the city's expert opined that the fair market value was $1,074,395. *Id.* The mission also presented testimony from non-appraiser experts, who testified about the advantages of a concrete building over a steel frame building. *Id.* One of these witnesses, the owner of a construction firm, testified that the cost of replacing the building with a concrete frame would be $3,490,195, whereas building a comparable steel frame building would cost $2,280,453. *Id.* The jury determined that the fair market value of the property was $2,100,000. *Id.* The city appealed. *Id.*

The Redevelopment Authority argued that *Genge* controlled the outcome of the case. *Id.* at 669. Arguing in favor of the jury award (which exceeded the appraisals of both experts), the Rescue Mission asserted that the construction firm owner's "testimony concerning the cost of the concrete frame was credible evidence to support the jury award, because, when used in the cost approach equation, it established an upper fair market value range of $2,207,607, which exceeded the jury award." *Id.* at 668. The Court concluded that "the jury has the discretion to insert a cost of replacement figure into the cost approach to

of Mr. Farrell, the landowner, regarding the before and after values of the property, which was consistent with the verdict. It is an accepted principle of Tennessee law that "the owner of real property is held to be qualified, by reason of his ownership alone, to give an opinion in evidence of the value of his land." *Livingston Limestone Co.*, 547 S.W.2d at 943. Moreover, Mr. Farrell testified to his additional qualifications as a real estate developer with more than 25 years of experience. *See generally Hooper*, 2010 WL 1712968, at *9 (crediting the testimony of the landowners by virtue of their ownership as well as "their personal experience in buying and selling real estate in the area").

The jury in this case heard opinion testimony from several experts and from the landowner and assessed the credibility of all of the witnesses. Piedmont did not file a motion for directed verdict to challenge the sufficiency of the evidence. We find no basis for overturning the jury verdict.

Piedmont's argument regarding discretionary costs was premised upon this Court granting a new trial. Therefore, the issue is pretermitted.

CONCLUSION

The judgment of the trial court is affirmed. Costs of this appeal are assessed against the appellant, Piedmont Natural Gas, for which execution may issue if necessary.

/s/ Andy D. Bennett
ANDY D. BENNETT, JUDGE

---

arrive at its own fair market value of the property" and that "the jury is not limited to considering only the ultimate opinions of expert appraisers as to fair market value, but should consider and weigh all evidence in reaching its verdict." *Id.* at 669. Citing its decision in *Hurkman v. State*, 130 N.W.2d 244 (Wis. 1964), the Court emphasized that *Genge* was not intended to establish that a "rigid rule concerning ranges of expert testimony be applied, but rather that when before- and after-taking values were compared, equivalent principles and assumptions should be applied." *Id.* at 670. The Court further stated: "[A] narrow reading of *Genge* conflicts with other principles of jury discretion. The jury is obligated to consider all credible evidence and make reasonable inferences from the evidence in reaching its decision on a special verdict." *Id.* The Court affirmed the jury's verdict. *Id.* at 671.

We further note that, in two of the other cases cited by Piedmont, there were dissenting opinions. *See Jagow v. E-470 Pub. Hwy. Auth.*, 49 P.3d 1151, 1162 (Colo. 2002) (Kourlis, J., dissenting) (discussing how the majority failed to afford the commission, which was fulfilling a jury's role, the appropriate deference); *Energy Transp. Sys., Inc. v. Mackey*, 674 P.2d 744, 749 (Wyo. 1984) (Cardine, J., dissenting) (finding the jury's acceptance of the testimony of one expert to determine the before-taking value and the testimony of another expert to determine the after-taking value and the diminution in value to be "reasonable, within and supported by the evidence presented").